Burgess v. Bell 















IN THE
TENTH COURT OF APPEALS
 

No. 10-92-196-CV

     HAROLD PAYNE BURGESS, ET AL.,
                                                                                              Appellants
     v.

     SHERWOOD BELL,
                                                                                              Appellee
 

From the County Court
McLennan County, Texas
Trial Court # 910525 PR1
                                                                                                    

O P I N I O N
                                                                                                    

      Harold Burgess and Fannie Mae Williams are appealing a judgment in favor of Sherwood Bell
in a determination-of-heirship suit. First, they contend that the evidence was insufficient to
support the court's finding that Sherwood was the biological son of John Burgess, the decedent. 
Second, they argue that Sherwood's cause of action is barred by the statute of limitations. We
affirm.
      John Burgess died on August 18, 1991. Harold Burgess, John's brother, filed an application
for appointment as administrator of John's estate on August 20. Sherwood Bell, claiming to be
John's biological child, contested Harold's application and filed an application for letters of
independent administration. On October 17, Sherwood was granted letters of administration in
the estate of John Burgess. 
      On December 4, Harold filed an application for determination of heirship, asking that he and
his sister, Fannie Mae, be determined to be John's the only heirs. Sherwood filed an application
requesting that the court find that he is John's biological child. On March 12, 1992, a judgment
was signed declaring Sherwood the biological child of John Burgess with the right of inheritance
as his sole heir.
      Harold and Fannie Mae contend in their first point that the evidence is insufficient to support
the court's ruling that Sherwood Bell is the biological child of the deceased. Section 42(b)(1) of
the Probate Code provides:
A person claiming to be a biological child of the decedent, who is not otherwise
presumed to be a child of the decedent, may petition the probate court for a determination
of right of inheritance. If the court finds by clear and convincing evidence that the
purported father was the biological father of the child, the child is treated as any other
child of the kindred, both descendants, ascendants, and collaterals in all degrees, and they
may inherit from him and his issue.

Tex. Prob. Code Ann. § 42(b)(1) (Vernon Supp. 1993). Thus, upon a showing by clear and
convincing evidence that a person is the biological offspring of the father, that person is entitled
to inherit through his or her paternal kindred, both ascendants and descendants. Brown v.
Edwards Transfer Co., 764 S.W.2d 220, 223 (Tex. 1988). 
      Clear and convincing evidence is "that measure or degree of proof which will produce in the
mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be
established." In Interest of G.M., 596 S.W.2d 846, 847 (Tex. 1980). This is an intermediate
standard, falling between the preponderance standard of ordinary civil proceedings and the
reasonable-doubt standard of criminal proceedings. Id. "While the proof must weigh heavier than
merely the greater weight of the credible evidence, there is no requirement that the evidence be
unequivocal or undisputed." Doria v. Texas Dept. of Human Resources, 747 S.W.2d 953, 955
(Tex. App.—Corpus Christi 1988, no writ).
      The fact-finder must decide what evidence is clear and convincing in each case. Garza v.
Maverick Market, Inc., 768 S.W.2d 273, 276 (Tex. 1989). The following evidence has been
helpful to the fact finder in determining paternity:
• Blood tests.
• Evidence of physical resemblance of the child and the alleged father, either by 
photographs of the child and father, or by the offer of the child itself.
• Prior statements by the alleged father that he was the father of the child, or other 
admissions by him bearing on his relationship to the child.
• Evidence of periods of conception and gestation.
Id. Other courts have found this evidence to be helpful:
• The mother and alleged father lived together temporarily.
      • The alleged father never denied the child was his.
      • The alleged father periodically supported the child with money and necessities.
McNary v. Khan, 792 S.W.2d 126, 127 (Tex. App.—Dallas 1990, no writ).
      Here, nine witnesses testified that John had admitted that Sherwood was his son. 
Additionally, a picture of John and Sherwood was introduced into evidence to show a
resemblance. Also, John's family members testified that they had accepted Sherwood into their
family. Furthermore, testimony also showed that John had provided financial support to
Sherwood. From this evidence a reasonable-fact finder could find that Sherwood was the
biological son of John by clear and convincing evidence. See Garza, 768 S.W.2d at 276. We
overrule point one.
      In their second point Harold and Fannie Mae argue that Sherwood's cause of action is barred
by the statute of limitations. Sherwood timely filed his contest under section 10 of the Probate
Code. See Tex. Prob. Code Ann § 10 (Vernon 1980). Section 42(b) gave him the right to
contest. See id. Application of the statute of limitations, as the appellants suggest, would violate
Sherwood's equal-protection rights. See Dickson v. Simpson, 807 S.W.2d 726, 727 (Tex. 1991). 
We overrule point two and affirm the judgment.

                                                                                 BOB L. THOMAS
                                                                                 Chief Justice
Before Chief Justice Thomas,
          Justice Cummings, and
          Justice Vance
Affirmed
Opinion delivered and filed February 3, 1993
Do not publish



utweighed by contrary evidence as to
be clearly wrong and unjust, we will reverse the judgment and remand the cause for a new trial.
FACTUAL AND PROCEDURAL BACKGROUND
      Around 1:00 or 1:30 p.m., delivery-truck drivers Daniel Phillips and Joseph Bailey arrived
at a convenience store to deliver beer. (Phillips testified 1:30, and Bailey testified 1:00.) Within
ten minutes Bailey noticed a black male outside the store who was wearing a tan sports coat with
no shirt, dark pants, and a plastic cap on his head with a baseball cap over it. Bailey later
described the man as weighing about 110 pounds. At one point the man appeared to be using the
area behind the store as a restroom. Then the man apparently pretended to use the outside
telephone, because Bailey observed him holding the receiver but not talking. Bailey observed the
man up close a total of fifteen to twenty seconds as Bailey went in and out of the store with beer. 
About 1:50 p.m., Pamela Jones, a patient of Mental Health and Mental Retardation (“MHMR”)
who worked at the store,


 arrived for her shift and also saw the black male. He was standing at
the telephone, and he waved at her. She had seen him in the store twice before. She said she
stopped and stared at him because he was wearing a sports coat on a hot day, and had on a plastic
cap with a baseball cap over it. Once Phillips was alone in the parking lot, the black male, whom
Phillips had not previously noticed, approached Phillips from behind and robbed him at gunpoint,
taking twenty-seven hundred and fifty dollars. Phillips saw the man for three seconds, part of
which was spent looking at the gun. He accurately described the man’s clothing, and said the man
weighed about 160 pounds.
      The robber left the scene on foot. While he was leaving, customer Bryan Bibles pulled up
in his vehicle. Bibles was an Army veteran who worked out of the Veterans Hospital as a National
Service Officer for disabled veterans. Bibles testified he saw a man running away from the store. 
The man was wearing a scraggly brown coat, and had on a knit cap over an Afro hair style. 
Bibles testified he recognized the man to be someone he knew as “Nate” with whom he went to
high school. He did not know the man’s last name, although “Nate” was later identified to him
as Nathaniel Lewis. Bibles had given Lewis a ride a month and a half earlier and dropped him
off where he believed Lewis lived, a few streets from the convenience store where the robbery
occurred. Bibles testified he told police he saw “Nate” running from the store. He also told
police of another store where Lewis often hung out. Bibles would see Lewis there, and Lewis
would ask for money to buy beer. By coincidence, Bibles also knew Ward with whom he also
went to high school, but whom he had seen only two or three times in the last several years. 
When Bibles read in the paper Ward had been arrested, he called police to inform them they had
the wrong man. Bibles testified at trial that Ward was not the man he saw at the scene of the
robbery. 
      When Officer Torres arrived at the scene, he somehow came up with Ward’s name as the
robber. Torres testified Bibles told him Bibles saw Ward running from the scene. Bibles testified
he told Torres he saw “Nate” running from the scene, meaning Nathaniel Lewis.


 
      Officer January put together a photographic lineup with Ward’s picture,


 and after Bibles’s
call, he put together a second lineup by simply substituting Lewis’s picture for Ward’s. January
showed the lineup with Ward’s picture to Phillips, Bailey, and Jones, who selected Ward. He
testified he later showed the lineup with Lewis’s picture to only Phillips and Jones who did not
select anyone. However, Bailey testified that January showed him and Phillips two separate
lineups at the same time, four days after the robbery. January contradicted Bailey’s testimony,
claiming that there was an eleven-day interval between showings. Jones testified she was
awakened by January four days after the robbery. She said: He “showed me some pictures. . .
. He said do I see the person, and I say, yes, sir. And I pointed. And he showed me some other
different kind of pictures, different, row after row. He asked me do I see him, and I say yes, sir. 
Can you point him out. I say yes, sir. I say yes, sir. Can you sign and date it. I say yes, sir. 
And I went back to sleep.” 
      These three witnesses also identified Ward at trial. Phillips and Bailey emphasized a small
mark on Ward’s left temple. Both omitted this detail from their written statements to police. In
their interviews with police, they sometimes described the mark as a scar and sometimes as a
mole.


 Jones, who got the best and longest look at the robber, never mentioned the mark.
                                  Four of Ward’s co-workers testified at trial that he was at work on the day of the robbery. 
None of them were friends or relatives of his. Ed Degrate, the supervisor, sponsored Ward’s time
card which was admitted into evidence to show Ward worked from 6:51 a.m. to 3:16 p.m., and
took lunch from 12:04 p.m. to 12:96 p.m.


 Degrate said the parking lot where Ward parked was
two or three hundred yards from the building. He also said workers who tried to sneak out during
the work day often got caught. Gussie Miles saw Ward finishing his lunch in the break room
around 1:00 p.m. They had a brief conversation about a revival going on at her church, and Ward
said he wanted to attend. Lisa Childers performed a quality check of materials at Ward’s work
station about 1:30 and Ward was there. She wrote the time down on a record sheet. Dwayne
Norvell, who had to be subpoenaed by the defense because he did not want to get involved, was
a machine repairman at Ward’s workplace. He testified that between 1:00 and 2:45 he repaired
the machine next to the one Ward operated everyday, and that Ward assisted him during the entire
time by periodically sending items down a conveyor belt between the machines; the items were
wrapped by the machine Norvell was working on. He and Ward were ten to fifteen feet apart.


 
Finally, there was testimony that it would take at least five minutes for a person at Ward’s
workplace to drive to the convenience store. 
      The jury found Ward guilty. At punishment the jury learned that Ward, in his late thirties,
had been married for ten years and had three children — one in elementary school, a second about
to graduate high school, and a third about to begin college. His wife was a case worker with
MHMR and also attended college. Ward was convicted in 1986 on felony charges of cocaine and
marijuana possession, for which he served concurrent two-year sentences. Since his release he
had been employed full-time, sometimes working two jobs. When arrested for this robbery, he
was in possession of a small amount of marijuana. The jury assessed punishment at forty-five
years in prison.
STANDARD OF REVIEW
      The standard of review for a factual sufficiency claim, which is derived from Clewis v. State,
922 S.W.2d 126 (Tex. Crim. App. 1996),


 is set forth in Johnson v. State, 23 S.W.3d 1 (Tex.
Crim. App. 2000).


 The reviewing court “asks whether a neutral review of all the evidence, both
for and against the finding, demonstrates that the proof of guilt is so obviously weak as to
undermine confidence in the jury’s determination, or the proof of guilt, although adequate if taken
alone, is greatly outweighed by contrary proof” “to the extent that the [finding of guilt] is clearly
wrong and manifestly unjust.” Id. at 11. The court does not view the evidence through the prism
of “in the light most favorable to the prosecution.” Johnson, 23 S.W.3d at 7 (quoting Clewis, 922
S.W.2d at 129). “The court reviews the evidence weighed by the jury that tends to prove the
existence of the elemental fact in dispute and compares it with the evidence that tends to disprove
that fact.” Johnson, 23 S.W.3d at 7 (quoting Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim.
App. 1996)). The appellate court “does not indulge in inferences or confine its view to evidence
favoring one side of the case. Rather, it looks at all the evidence on both sides and then makes
a predominantly intuitive judgment. . . . “ Johnson, 23 S.W.3d at 7 (quoting William Powers and
Jack Ratliff, Another Look at “No Evidence” and “Insufficient Evidence,” 69 Tex. L. Rev. 515,
519 (1991)). “In conducting its factual sufficiency review, an appellate court reviews the fact
finder’s weighing of the evidence and is authorized to disagree with the fact finder’s
determination.” Johnson, 23 S.W.3d at 7 (quoting Clewis, 922 S.W.2d at 133). 
      A review of a claim of factual insufficiency of the evidence requires an understanding of the
applicable burden of proof at trial. The Supreme Court considered “proof beyond a reasonable
doubt” in In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The Court for
the first time held explicitly that the Fourteenth Amendment Due Process Clause of the United
States Constitution “protects the accused [in a criminal case] against conviction except upon proof
beyond a reasonable doubt of every fact necessary to constitute the crime with which he is
charged.” Id., 397 U.S. at 364, 90 S.Ct. at 1073. The Court described proof beyond a
reasonable doubt as “a prime instrument for reducing the risk of convictions resting on factual
error.” Id., 397 U.S. at 363, 90 S.Ct. at 1072. “A person accused of a crime . . . would be at
a severe disadvantage, a disadvantage amounting to a lack of fundamental fairness, if he could be
adjudged guilty and imprisoned for years on the strength of the same evidence as would suffice
in a civil case.” Id., 397 U.S. at 363, 90 S.Ct. at 1072 (quoting In the Matter of Samuel W. v.
Family Court, 24 N.Y.2d 196, 205, 299 N.Y.S. 414, 422, 247 N.E.2d 253, 259 (1969)). In the
more general context of protecting the interests of society, the Court said: “It is also important in
our free society that every individual going about his ordinary affairs have confidence that his
government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder
of his guilt with utmost certainty.” In re Winship, 397 U.S. at 364, 90 S.Ct. at 1073.



      In conducting our review, we acknowledge the general rule that typically the credibility of the
witnesses, the weight to be given their testimony, and the resolution of conflicts in their testimony
are questions left to the discretion of the jury. Johnson, 23 S.W.3d at 7; Tex. Code Crim. Proc.
Ann. arts. 36.13, 38.04 (Vernon 1981 and 1979). The rule makes sense in many instances,
because we cannot evaluate certain matters from a cold record, e.g., a witness’s demeanor or voice
inflection, and because our role in a non-de novo review is not simply to substitute our opinion
for the jury’s as though we were the trial jury. However, we are not barred from considering
these issues. See Johnson, 23 S.W.3d at 8. If we were, our right and obligation as the
constitutional guardian against convictions based on factually insufficient evidence would be
nullified. When there is a basis in the record from which we can fairly evaluate credibility and
the weight of evidence, and resolve conflicts in testimony, that evaluation is within our purview. 
“Documents or objective evidence may contradict the witness’ story; or the story itself may be so
internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. 
Where such factors are present, the court of appeals may well find clear error even in a finding
purportedly based on a credibility determination.” Whitsey v. State, 796 S.W.2d 707, 722 (Tex.
Crim. App. 1989) (on rehearing) (quoting Anderson v. Bessemer City, 470 U.S. 564, 575-76, 105
S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985)).
APPLICATION
      The issue is identity. The State’s case relies entirely on three eyewitnesses who identified
Ward from a photographic lineup as the robber, and who also identified Ward at trial. However,
our obligation is to consider in a neutral light all the evidence both for and against the conviction. 
If the evidence that tends to disprove guilt overwhelms the evidence that tends to prove guilt, then
the conviction is clearly wrong and unjust and must be set aside.
      In conducting our review, we are cognizant of our duty to “detail the evidence relative to the
issue in consideration and clearly state why the jury’s finding is factually insufficient,” and to
“state in what regard the contrary evidence greatly outweighs the evidence in support of the
verdict.” Johnson, 23 S.W.3d at 7 (citing Clewis, 922 S.W.2d at 135).
      From the testimony and documentary evidence at trial, the following facts are not reasonably
in dispute:•Between approximately 1:30 p.m. and 2:00 p.m. Phillips and Bailey were delivering beer
to the convenience store. (Bailey moves the time back thirty minutes, testifying they
arrived about 1:00 p.m., and that he first saw the robber about 1:10.)
      •    Jones arrived about 1:50 p.m., and within a few minutes the robbery occurred. Only
Phillips was in the parking lot and experienced the robbery.
      •    The robber was a black male wearing a tan sports jacket, no shirt, and a plastic cap with
a baseball cap over it. He was loitering in the parking lot, appeared to use the area in
back of the store as a restroom, pretended to talk on the telephone, and waved at Jones
who recognized him as a previous customer.
      •    After the robbery, the robber ran away. No car was seen. Bibles arrived and saw the
robber running away. He identified the man as Nate Lewis whom he knew. Bibles also
knew Ward.
      •    Ward’s machine-stamped time card showed he worked the day of the robbery from 6:51
a.m. to 3:16 p.m., and took lunch from 12:04 p.m. to 12:96 p.m.


 
      •    Ward was seen by two co-workers, one about 1:00 p.m. and the other about 1:30 p.m. 
      •    The machine next to Ward’s happened to break down that day, and co-worker Norvell
worked on it from about 1:00 p.m. to about 2:45 p.m. He had to have Ward’s assistance
periodically during this time.
      •    It was possible to leave the workplace without permission, but workers doing this often
got caught.
      •    It was about a five-minute drive from Ward’s workplace to the convenience store, which
does not include the walking time needed to cover the two to three hundred yards from
the building to the parking lot.      
      Based on these facts and the eyewitness identification of Ward, the State’s theory of the case
was this: Ward clocked in from lunch about 1:00 p.m., visited with co-worker Miles about
church, and went to his work station where he made contact with co-worker Childers about 1:30
p.m. The machine next to his unexpectedly broke down, and co-worker Norvell was repairing
it. Ward took a chance on getting caught and left the work place without permission. He walked
two to three hundred yards to his car, took off his shirt, put on a sports jacket and a plastic shower
cap with a baseball cap over it, retrieved his gun, and drove to the convenience store. He left his
car somewhere away from the store and walked. He arrived at the store about 1:45 p.m. Then
he loitered in the parking lot, went behind the store for a restroom break, and pretended to use the
telephone while he “cased” Phillips and Bailey — whom he found fortuitously in the parking lot
— for a robbery. He also waved at Jones as she arrived for work. About 1:55 p.m., when
Phillips was alone, Ward robbed him and then ran back to his car. Ward took off the clothes he
had donned just for the robbery, put his shirt back on, and drove back to work. He sneaked back
to his work station, arriving about 2:10 p.m. Ward then proceeded to finish the remaining hour
of his workday. The State discounts Norvell’s testimony as being false.
      The following evidence tends to disprove the State’s theory and therefore tends to disprove
guilt:
      •    Phillips saw the robber a total of about three seconds under the stress of being robbed at
gunpoint, and Bailey saw him a total of fifteen to twenty seconds.
      •    Jones was a MHMR patient on medication for chronic depression.
      •    Phillips and Bailey claimed the robber had a mark which at various times they described
as either a scar or a mole. Jones, who had the best and longest look, never mentioned
any mark, scar, or mole. 
      •    Bibles was the only one of the four eyewitnesses who knew Ward, and he stated the
robber, whom he also knew, was not Ward, but “Nate” Lewis. He disputed telling
Officer Torres he saw Ward. Investigating officers never attempted to interview Lewis.
      •    Although denied by Officer January, Bailey testified that January simultaneously showed
him and Phillips two six-person photographic lineups.


 In addition, Jones testified she
was shown other pictures before she was shown the lineup with Ward’s picture. 
      •    Three co-workers established Ward’s presence at work that afternoon, one twenty
minutes before the robbery. A fourth, Norvell, placed Ward at work during the exact
time of the robbery. Norvell had to be subpoenaed to trial because he did not want to get
involved. There was no evidence that any of Ward’s four co-workers were personal
friends of Ward, or had any other motive to lie. 
      •    Ward’s machine-stamped time card placed him at work during the exact time of the
robbery. 
      •    Police interviewed eleven co-workers at Ward’s workplace who were not able to establish
an alibi. However, no one noticed Ward being away from his work station at any time.
      •    The robber waved at Jones as though he knew her. It seems unlikely Ward would go to
the store to commit a robbery, and before doing so deliberately call attention to himself
by waving at someone there; however, someone loitering who made a last-minute
decision to commit a robbery might.
      •    There was no physical evidence linking Ward to the robbery. 
      •    There was no evidence of motive, and Ward was gainfully employed.
      In reviewing the evidence, we ask whether the proof contrary to guilt greatly outweighs the
proof of guilt to the extent that the finding of guilt is clearly wrong and manifestly unjust. 
Johnson, 23S.W.3d at 11. We find that the probability the events occurred as the State alleges
is very low. For one, the time line necessary for Ward to have committed the robbery requires
almost split-second timing. Furthermore, a number of events do not make sense, such as why
Ward would wave at Jones, and why he would take off his shirt. Also, two of the State’s three
eyewitnesses observed the robber for only a brief period of time, and the third was under
medication for a mental condition. There also was discrepant testimony from these witnesses
about a mark on the robber’s face. In addition, the photographic lineup procedures used by the
police are suspect. Finally, the State put on no physical evidence linking Ward to the crime, and
asserted no motive why a hard-working family man would commit the crime. 
      At the same time, the sizeable evidence contrary to guilt cannot be resolved. The State never
effectively challenged Ward’s alibi defense, which consisted not only of three witnesses who
placed him at work at the time of the robbery, but also of documentary evidence, his machine-stamped time card, which also placed him at work during the robbery, and on which were stamped
times which corresponded to the times given by co-workers about when they spoke to Ward at
work. This evidence cannot simply be ignored. In addition, there was a plausible alternate
suspect, Lewis, whom the police never interviewed, even though an eyewitness specifically
identified him as the robber. 
      Reminded that the jury must have had no reasonable doubt, we find that the evidence taken
as a whole is factually insufficient, and the verdict is contrary to the law and the evidence. On this
evidence Ward’s conviction is clearly wrong and manifestly unjust. Therefore, Ward should have
a new trial. Tex. R. App. P. 21.3(h) (“The defendant must be granted a new trial . . . when the
verdict is contrary to the law and the evidence.”); Tibbs v. Florida, 457 U.S. 31, 32, 102 S.Ct.
2211, 2213, 72 L.Ed.2d 652 (1982); Clewis, 922 S.W.2d at 133-34.
CONCLUSION
      Finding the evidence factually insufficient to support the verdict, we reverse the judgment and
remand the cause for a new trial.
 
                                                                   BILL VANCE
                                                                   Justice

Before Chief Justice Davis,
      Justice Vance, and
      Justice Gray
      (Justice Gray Dissenting)
Reversed and remanded
Opinion delivered and filed May 23, 2001
Publish