Bergan, J.
A main objective of the special system of law. for treating young juvenile offenders is to hold them as children apart from the usual methods and ineradicable consequences of the criminal law. This court in People v. Lewis (260 N. Y. 171) expressed, in 1932, the hope and the purpose of the framers of the early New York juvenile delinquency statutes, beginning with the Children’s Court Act in 1922, that the proceedings were not designed to be punitive but were for the protection and training of a child found in difficulty; and would be administered by humane and parentally minded Judges whose end was not to punish, but to save the child.
The successful juvenile court is concerned primarily with the totality of factors which cause a child to meet difficulty in his life, and only incidentally with the event which brings the child to the court, which may itself play only a small role in that problem.
The Judge, acting as a mature and well-balanced parent, tries to find the answer to the child’s trouble; and only if all else fails and there is no other recourse, does he commit the child *198 to any institution, and even then he tries to find the one best suited to the child’s needs and having the fewest punitive policies.
Nothing could be farther removed in temper and purpose than this from the criminal court for adults. And although it has failed, as all human institutions have a tendency j;o do, always to reach its highest purpose; and has sometimes in method and result seemed to act like a criminal court, it is not reasonably arguable that in the half-century or so of its existence in the United States the juvenile court has profoundly changed for the better the way children in difficulty are treated by the public legal system.
In such a court, the accoutrements of due process evolved from the 18th Century experience with the rigors of common-law prosecutions — public trial, shields against self incrimination, adversary inquiry into the single event which brought the child to court — seem irrelevant.
As Judge Crouch wrote for the majority in Lewis (p. 177): “ For the purposes of this case, the fundamental point is that the proceeding was not a criminal one. The State was not seeking to punish a malefactor. It was seeking to salvage a boy who was in danger of becoming one. In words which have been often quoted, £ the problem for determination by the judge is not, Has this boy or girl committed a specific wrong, but What is he, how has he become what he is, and what had best be done in his interest and in the interest' of the state to save him from a downward career. ’ (23 Harvard Law Review, 104, 119,£ The Juvenile Court,’ by Julian W. Mack.) * * * Since the proceeding was not a criminal one, there was neither right to nor necessity for the procedural safeguards prescribed by constitution and statute in criminal cases.”
In that case an important constitutional question was squarely met. The Trial Judge examined the 15-year-old boy as to the facts of alleged delinquency in a private hearing, but in the presence of his family and clergyman, without warning against self incrimination (pp. 173-174). The boy admitted the facts and on his admission the adjudication of juvenile delinquency Avas made. It was not, Judge Crouch noted, in examining the constitutional problem, “ a criminal trial and there was no defect” (p. 174).
*199 Apart from how the Constitution may he read in its effect on highly informal proceedings looking into the circumstances in which a child is failing in normal growth and in adaptation, there is a genuine and responsibly held difference of opinion about what is best to do. Many sociologists believe that the criteria of the criminal law and its methodology, including protection against self incrimination and the right to counsel in the case of the young child, impair rather than help a process designed not as punishment but as salvation.
A lawyer’s traditional professional duty in an adversary proceeding is to do what he can and fight as hard as he can, to see his client wins. In the criminal case this is to see his client acquitted, the charge reduced, or the punishment minimized. But a child’s best interest is not necessarily, or even probably, promoted if he wins in the particular inquiry which may bring him to the juvenile court.
And since the lawyer as advocate ought not be stultified in his professional obligation to sustain his cause, he should likewise not be cast in the role of impartial adviser to the court on the social problem involved; and, thus, the original view of the founders of the juvenile court that it would be better not to have formal adversary proceedings remains essentially valid.
Self incrimination in the historic Star Chamber sense in which the Bill of Bights was concerned is thought by proponents of the juvenile court to have no relevancy to a process in which the particular act which brought the child to the inquiry may play no significant part in an attempt to see him in his total environment and to help him. In theory, at least, there is nothing to incriminate and there is no criminal.
There is, naturally enough, another side of the coin. A different view is shared by a number of lawyers concerned. They see some danger of erosion of constitutional rights in the informality and lack of ‘ ‘ legality ’ ’ in the way juvenile court Judges in practice deal with the children’s cases. And they are concerned, also, that ‘ ‘ fairness ’ ’ by the customary standards of the adult criminal case is being withheld from children in juvenile courts.
It is pointed out that the event that brings the child before the Judge is, by definition, the equivalent of a crime, i.e., an “act which, if done by an adult, would constitute a crime ” *200 (Family Ct. Act, § 712, subd. [a]). It is noted, additionally, that the disposition of the case, although not penal in nature, may sometimes be not much different from that of youthful offenders convicted under the criminal laws. Under very limited circumstances, for example, the juvenile may be committed to Elmira Deception Center or other similar institutions (Family Ct. Act, § 758, subd. [b]).
Careful and fully explicit safeguards, however, are provided in the statute to insure that an adjudication of this kind is not a “ conviction ” (§ 781); that it affects no right or privilege, including the right to hold public office or to obtain a license ('§ 782); and a cloak of protective confidentiality is thrown around all the proceedings (§§ 783-784). These protections have had full judicial implementation (Matter of Giroffi, 283 App. Div. 890; Murphy v. City of New York, 273 App. Div. 492; Matter of Hambel [Levine], 243 App. Div. 530; Hill v. Erie R. R. Co., 225 App. Div. 19).
Although this plenary protection to good name and status is very different from the residual disabilities flowing from criminal conviction, the argument in favor of criminal court protective rights for delinquent children continues to stress the possible loss of freedom as one consequence of the proceeding.
The juvenile court system, on the basis of that argument, has had the singular misfortune of being impaled on the sharp points of a few hard constitutional cases (e.g., Matter of Gault, 387 U. S. 1; Kent v. United States, 383 U. S. 541; Matter of Gregory W., 19 N Y 2d 55). This possibility and, in the particular instances, the actuality, were the bases of reasoning by which the court in cases such as Gault and Gregory W. applied criminal law protective techniques to the juvenile proceedings.
They were not only hard cases; each had facts easily dramatized. They were not typical of the vast mass of juvenile proceedings in the United States. In Gault there was an absence of elemental fairness. The complainant was not sworn and did not appear in court; there was no adequate notice of the proceedings 'given to the parents; there was no counsel or offer of counsel; no record was made of proceedings; there was no right of appeal or review; and the juvenile court Judge, explain *201 ing his action, seemed to have a somewhat vague notion of the alternatives open to him (387 IT. S. 1, 28-29). The court, accordingly, was able to reach the encompassing conclusion (p. 29): “ The essential difference between Gerald’s case and a normal criminal case is that safeguards available to adults were discarded in Gerald’s case.”
The facts in Matter of Gregory W. (supra) were almost equally dramatic. One 12-year-old child, mentally disturbed, was detained by police and questioned for 24 hours; the other 12-year-old child for 10 hours. This period was regarded as unreasonable and their admissions held to have been coerced. And Kent v. United States (383 IT. S. 541, supra), the precursor of Gault, was also a hard case. There, the Juvenile Court of the District of Columbia waived jurisdiction of that court and transferred petitioner to the District Court for criminal proceedings against him with a resulting heavy penal sentence without giving him an adversary right to oppose the waiver. This decision was held arbitrary.
It can scarcely be doubted that Gault and Kent have had an adverse effect on the concept of a juvenile court free from the technicalities of the criminal law. (See, e.g., the comment of the Supreme Court of Dlinois on Gault that the ‘‘ opinion exhibits a spirit that transcends the specific issues there involved ” [In re Urbasek, 38 Ill. 2d 535, 541].)
Historically, as it has been seen, a majority of this court gave ungrudging support to the concept of a system of dealing with children’s cases free from criminal law technicalities in People v. Lewis (260 N. Y. 171, supra). It is interesting to note that the present constitutional issue was joined in that case almost 40 years ago in the strong dissent of Judge Crane, with whom Judge Kellogg concurred, in which substantially all of the objections that have since developed were examined, especially the protection against self incrimination. (See 260 N. Y., pp, 179-185.)
But, of course, the decisions of the majority in Lewis could no longer survive the constitutional views which now are dominant ; and, indeed, the Legislature has given extensive statutory implementation to procedures which in many respects run the juvenile procedure in close parallel to the adult criminal courts. (See, e.g., Family Ct. Act, art. 7: Part 2, Custody and Detention, *202 §'§ 721, 724, 726, 729; Part 3, Preliminary Procedure, §§ 731, 736, 738; Part 4, Hearings, §§ 741, 744, 745, 746, 748; Part 5, Orders, §§ 752, 758; Part 6, New Hearing and Reconsideration of Orders, § 761.)
Whether these techniques really help the child, whose interest it is the declared purpose of the State to protect, remains a debated question, unresolved between the advocates of two quite different methods and two different philosophies. It seems probable we cannot have the best of two worlds. If the emphasis is on constitutional rights something of the essential freedom of method and choice which the sound juvenile court Judge ought to have is lost; if range be given to that freedom, rights which the law gives to criminal offenders will not be respected. But the danger is that we may lose the child and his potential for good while giving him his constitutional rights.
Some such discussion as that which has been undertaken seems useful to put the present case in perspective. It involves the constitutionality of section 744 (subd. [b]) of the Family Court Act, which is one of the provisions governing the procedure in juvenile delinquency. The section provides that any determination at the conclusion of an adjudicatory hearing that the child did an act “ must be based on a preponderance of the evidence ”. In a criminal case the standard of proof is beyond a reasonable doubt; that is, if there be a “ reasonable doubt” he is “ entitled to an acquittal” (Code Crim. Pro., §389).
The Family Court in the present case made a specific finding by a fair preponderance of the evidence that the fact alleged against the 12-year-old appellant, to the effect he had removed $112 from petitioner’s pocketbook and stolen it, was true. The law guardian contemporaneously raised the question of the constitutional sufficiency of the finding. The sufficiency of the finding is the only question on this appeal.
It is not easy to define for the purposes of practical application the tenuous difference between ‘ ‘ beyond a reasonable doubt ” as a quantitative or qualitative test of proof, and “ by a fair preponderance of the evidence ”, It is enough to say that for a very long time one has been used in the criminal law and the other in civil law, and that the profession accepts the view that beyond a reasonable doubt is a “ higher ’ ’ standard.
*203 But the standard is in the present ease expressly stated by statute; and, indeed, by a statute which goes very far in providing due process safeguards for children in delinquency proceedings in Family Court. The delinquency status is not made a crime; and the proceedings are not criminal. There is, hence, no deprivation of due process in the statutory provision; and, since the proceeding is quite different from a criminal prosecution, it seems reasonable to think there is no substantial equal protection question in the case.
The decision in Gault, in which there was almost a total absence of due process, is not necessarily to be read as an inters diction of this standard of proof required by the New York statute. It is not an absence of procedural due process that a noncriminal status determination have a different measure of proof than that required for conviction of crime. This was the holding of the District of Columbia Court of Appeals after a reading of Gault in Matter of Wylie (231 A. 2d 81). A contrary conclusion was reached in Illinois in In re Urbasek (38 Ill. 2d 535, supra). The question was not decisive in United States v. Gostanso (395 F. 2d 441),' where the judgment of adjudication was affirmed, and the Trial Judge had applied what the court regarded as a proper standard of proof.
The order should be affirmed, with costs.