Nathaniel WARD, Appellant,

v.

The STATE of Texas, Appellee.

No. 10–99–252–CR.

Court of Appeals of Texas, Waco.

May 23, 2001.

Walter M. Reaves, Jr., West, for appellant.

John W. Segrest, McLennan County Dist. Atty., James Wiley, Asst. McLennan County Dist. Atty., Waco, for appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## OPINION

VANCE, Justice.

Nathaniel Ward was sentenced to forty-five years in prison after a jury trial for aggravated robbery. Three eyewitnesses identified him as the robber. However, a fourth eyewitness identified someone else, and four co-workers testified that Ward was at work on the day of the robbery. Ward asserts on appeal that the evidence is factually insufficient to sustain the conviction.[1] Finding that the proof of guilt is

---

1. Ward also brings an issue on prosecutorial misconduct during the State's closing argument, which we need not address.

so greatly outweighed by contrary evidence as to be clearly wrong and unjust, we will reverse the judgment and remand the cause for a new trial.

### FACTUAL AND PROCEDURAL BACKGROUND

Around 1:00 or 1:30 p.m., delivery-truck drivers Daniel Phillips and Joseph Bailey arrived at a convenience store to deliver beer. (Phillips testified 1:30, and Bailey testified 1:00.) Within ten minutes Bailey noticed a black male outside the store who was wearing a tan sports coat with no shirt, dark pants, and a plastic cap on his head with a baseball cap over it. Bailey later described the man as weighing about 110 pounds. At one point the man appeared to be using the area behind the store as a restroom. Then the man apparently pretended to use the outside telephone, because Bailey observed him holding the receiver but not talking. Bailey observed the man up close a total of fifteen to twenty seconds as Bailey went in and out of the store with beer. About 1:50 p.m., Pamela Jones, a patient of Mental Health and Mental Retardation ("MHMR") who worked at the store,[2] arrived for her shift and also saw the black male. He was standing at the telephone, and he waved at her. She had seen him in the store twice before. She said she stopped and stared at him because he was wearing a sports coat on a hot day, and had on a plastic cap with a baseball cap over it. Once Phillips was alone in the parking lot, the black male, whom Phillips had not previously noticed, approached Phillips from behind and robbed him at gunpoint, taking twenty-seven hundred and fifty dollars. Phillips saw the man for three seconds, part of which was spent looking at the gun. He accurately described the man's clothing, and said the man weighed about 160 pounds.

The robber left the scene on foot. While he was leaving, customer Bryan Bibles pulled up in his vehicle. Bibles was an Army veteran who worked out of the Veterans Hospital as a National Service Officer for disabled veterans. Bibles testified he saw a man running away from the store. The man was wearing a scraggly brown coat, and had on a knit cap over an Afro hair style. Bibles testified he recognized the man to be someone he knew as "Nate" with whom he went to high school. He did not know the man's last name, although "Nate" was later identified to him as Nathaniel Lewis. Bibles had given Lewis a ride a month and a half earlier and dropped him off where he believed Lewis lived, a few streets from the convenience store where the robbery occurred. Bibles testified he told police he saw "Nate" running from the store. He also told police of another store where Lewis often hung out. Bibles would see Lewis there, and Lewis would ask for money to buy beer. By coincidence, Bibles also knew Ward with whom he also went to high school, but whom he had seen only two or three times in the last several years. When Bibles read in the paper Ward had been arrested, he called police to inform them they had the wrong man. Bibles testified at trial that Ward was not the man he saw at the scene of the robbery.

When Officer Torres arrived at the scene, he somehow came up with Ward's name as the robber. Torres testified Bibles told him Bibles saw Ward running from the scene. Bibles testified he told

---

**2.** Jones was on medication for chronic depression. She said: "[I]f I see something, a trauma, I just can't forget about it. So I take medication because it goes over and over in my brain."

Torres he saw "Nate" running from the scene, meaning Nathaniel Lewis.[3]

Officer January put together a photographic lineup with Ward's picture,[4] and after Bibles's call, he put together a second lineup by simply substituting Lewis's picture for Ward's. January showed the lineup with Ward's picture to Phillips, Bailey, and Jones, who selected Ward. He testified he later showed the lineup with Lewis's picture to only Phillips and Jones who did not select anyone. However, Bailey testified that January showed him and Phillips two separate lineups at the same time, four days after the robbery. January contradicted Bailey's testimony, claiming that there was an eleven-day interval between showings. Jones testified she was awakened by January four days after the robbery. She said: He "showed me some pictures. ... He said do I see the person, and I say, yes, sir. And I pointed. And he showed me some other different kind of pictures, different, row after row. He asked me do I see him, and I say yes, sir. Can you point him out. I say yes, sir. I say yes, sir. Can you sign and date it. I say yes, sir. And I went back to sleep."

These three witnesses also identified Ward at trial. Phillips and Bailey emphasized a small mark on Ward's left temple. Both omitted this detail from their written statements to police. In their interviews with police, they sometimes described the mark as a scar and sometimes as a mole.[5] Jones, who got the best and longest look at the robber, never mentioned the mark.

Four of Ward's co-workers testified at trial that he was at work on the day of the robbery. None of them were friends or relatives of his. Ed Degrate, the supervisor, sponsored Ward's time card which was admitted into evidence to show Ward worked from 6:51 a.m. to 3:16 p.m., and took lunch from 12:04 p.m. to 12:96 p.m.[6] Degrate said the parking lot where Ward parked was two or three hundred yards from the building. He also said workers who tried to sneak out during the work day often got caught. Gussie Miles saw Ward finishing his lunch in the break room around 1:00 p.m. They had a brief conversation about a revival going on at her church, and Ward said he wanted to attend. Lisa Childers performed a quality check of materials at Ward's work station about 1:30 and Ward was there. She

3. At the hearing on a motion for new trial, Beverly Adolphus, who was working inside the convenience store when the robbery occurred, testified that immediately after the robbery a female inside the store made the remark that "Nate" was the robber. Then someone else came into the store and said "that must have been Nathaniel Ward." She knew Ward from school. Several months earlier Ward had come into the store once or twice, but she had not seen him since. She knew where he lived and gave the location to her boss. She never told a police officer that Ward was the robber. She also knew Nathaniel Lewis who "is a frequent visitor to the store, and hangs out, and bums for money and stuff there." She said Lewis "wears something on his head all the time."

4. The picture was a jail mug shot in which Ward was wearing nothing on his head.

5. At trial, Bailey was brought by the prosecutor to defense counsel's table to point to the mark. The exchange was:

Q: I am going to ask you to look the defendant right in the face and see if you see that mark or scar on his face at this time.
A: Yes, sir.
Q: All right. Where is that?
A: Looks to be on the left-hand side of his face.
Q: Mr. Ward, we are going to try not to touch. Are we talking about this? (Indicating).
A: No. I was referring to this one over here. (Indicating).
Q: Point to it.
A: It's right here.
Q: Okay. Thank you.

6. Ward's time card registered hundredths of an hour, rather than minutes.

wrote the time down on a record sheet. Dwayne Norvell, who had to be subpoenaed by the defense because he did not want to get involved, was a machine repairman at Ward's workplace. He testified that between 1:00 and 2:45 he repaired the machine next to the one Ward operated everyday, and that Ward assisted him during the entire time by periodically sending items down a conveyor belt between the machines; the items were wrapped by the machine Norvell was working on. He and Ward were ten to fifteen feet apart.[7] Finally, there was testimony that it would take at least five minutes for a person at Ward's workplace to drive to the convenience store.

The jury found Ward guilty. At punishment the jury learned that Ward, in his late thirties, had been married for ten years and had three children—one in elementary school, a second about to graduate high school, and a third about to begin college. His wife was a case worker with MHMR and also attended college. Ward was convicted in 1986 on felony charges of cocaine and marijuana possession, for which he served concurrent two-year sentences. Since his release he had been employed full-time, sometimes working two jobs. When arrested for this robbery, he was in possession of a small amount of marijuana. The jury assessed punishment at forty-five years in prison.

## STANDARD OF REVIEW

The standard of review for a factual sufficiency claim, which is derived from *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim.App.1996),[8] is set forth in *Johnson v. State*, 23 S.W.3d 1 (Tex.Crim.App.2000).[9] The reviewing court "asks whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof" "to the extent that the [finding of guilt] is clearly wrong and manifestly unjust." *Id.* at 11. The court does not view the evidence through the prism of "in the light most favorable to the prosecution." *Johnson*, 23 S.W.3d at 7 (quoting *Clewis*, 922 S.W.2d at 129). "The court reviews the evidence weighed by the jury that tends to prove the existence of the elemental fact in dispute and compares it with the evidence that tends to disprove that fact." *Johnson*, 23 S.W.3d at 7 (quoting *Jones v. State*, 944 S.W.2d 642, 647 (Tex.Crim.App.1996)). The appellate court "does not indulge in inferences or confine

---

7. Norvell's credibility was questioned by the State because (1) he had not come forward to police earlier to exonerate Ward, and (2) the State claimed his testimony was inconsistent about the frequency with which he interacted with Ward that afternoon. Norvell said he did not come forward earlier because he preferred not to get involved. Regarding any inconsistencies in his testimony, when first asked on direct "Did you see him on that day?", he responded "I turned around and looked at him a couple of times to nod for him to run, you know." He also was asked "Would you be able to repair the machine that you were working on if Nathaniel or someone else was not at his machine?" He answered "No, I couldn't." Later under cross-examination he clarified that he had to stop the machine every ten minutes to clean it, after which he would nod to Ward. This occurred numerous times over the one hour and forty-five minutes he worked on the machine.

8. *Clewis* adopted its standard for review of factual sufficiency from a standard used in *Stone v. State*, 823 S.W.2d 375, 381 (Tex. App.—Austin 1992, writ refused, untimely filed). *Clewis*, 922 S.W.2d at 132.

9. Tex. Const. art. V, § 6 empowers courts of appeals to review evidence for factual sufficiency. *Clewis v. State*, 922 S.W.2d 126, 129–30.

its view to evidence favoring one side of the case. Rather, it looks at all the evidence on both sides and then makes a predominantly intuitive judgment. ..." *Johnson*, 23 S.W.3d at 7 (quoting William Powers and Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEX. L.REV. 515, 519 (1991)). "In conducting its factual sufficiency review, an appellate court reviews the fact finder's weighing of the evidence and is authorized to disagree with the fact finder's determination." *Johnson*, 23 S.W.3d at 7 (quoting *Clewis*, 922 S.W.2d at 133).

A review of a claim of factual insufficiency of the evidence requires an understanding of the applicable burden of proof at trial. The Supreme Court considered "proof beyond a reasonable doubt" in *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The Court for the first time held explicitly that the Fourteenth Amendment Due Process Clause of the United States Constitution "protects the accused [in a criminal case] against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.*, 397 U.S. at 364, 90 S.Ct. at 1073. The Court described proof beyond a reasonable doubt as "a prime instrument for reducing the risk of convictions resting on factual error." *Id.*, 397 U.S. at 363, 90 S.Ct. at 1072. "A person accused of a crime ... would be at a severe disadvantage, a disadvantage amounting to a lack of fundamental fairness, if he could be adjudged guilty and imprisoned for years on the strength of the same evidence as

would suffice in a civil case." *Id.*, 397 U.S. at 363, 90 S.Ct. at 1072 (quoting *In the Matter of Samuel W. v. Family Court*, 24 N.Y.2d 196, 205, 299 N.Y.S.2d 414, 422, 247 N.E.2d 253, 259 (1969)). In the more general context of protecting the interests of society, the Court said: "It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty." *In re Winship*, 397 U.S. at 364, 90 S.Ct. at 1073.[10]

In conducting our review, we acknowledge the general rule that typically the credibility of the witnesses, the weight to be given their testimony, and the resolution of conflicts in their testimony are questions left to the discretion of the jury. *Johnson*, 23 S.W.3d at 7; TEX.CODE CRIM. PROC. ANN. arts. 36.13, 38.04 (Vernon 1981 and 1979). The rule makes sense in many instances, because we cannot evaluate certain matters from a cold record, *e.g.*, a witness's demeanor or voice inflection, and because our role in a non-de novo review is not simply to substitute our opinion for the jury's as though we were the trial jury. However, we are not barred from considering these issues. *See Johnson*, 23 S.W.3d at 8. If we were, our right and obligation as the constitutional guardian against convictions based on factually insufficient evidence would be nullified. When there is a basis in the record from which we can fairly evaluate credibility and the weight of evidence, and resolve conflicts in testimony, that evaluation is within

---

**10.** Contrast the standard of review in federal court for sufficiency, which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The

*Jackson* standard of review, which views the evidence only in the light most favorable to the prosecution, "constitutes the minimum standard for sustaining a conviction under the Due Process Clause of the Fourteenth Amendment," and in Texas it is the standard for review of the legal sufficiency of the evidence. *Clewis*, 922 S.W.2d at 132.

our purview. "Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination." *Whitsey v. State,* 796 S.W.2d 707, 722 (Tex.Crim.App.1989) (on rehearing) (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 575–76, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985)).

## APPLICATION

■ The issue is identity. The State's case relies entirely on three eyewitnesses who identified Ward from a photographic lineup as the robber, and who also identified Ward at trial. However, our obligation is to consider in a neutral light all the evidence both for and against the conviction. If the evidence that tends to disprove guilt overwhelms the evidence that tends to prove guilt, then the conviction is clearly wrong and unjust and must be set aside.

■ In conducting our review, we are cognizant of our duty to "detail the evidence relative to the issue in consideration and clearly state why the jury's finding is factually insufficient," and to "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Johnson,* 23 S.W.3d at 7 (citing *Clewis,* 922 S.W.2d at 135).

■ From the testimony and documentary evidence at trial, the following facts are not reasonably in dispute:

- Between approximately 1:30 p.m. and 2:00 p.m. Phillips and Bailey were delivering beer to the convenience store. (Bailey moves the time back thirty minutes, testifying they arrived about 1:00 p.m., and that he first saw the robber about 1:10.)

- Jones arrived about 1:50 p.m., and within a few minutes the robbery occurred. Only Phillips was in the parking lot and experienced the robbery.

- The robber was a black male wearing a tan sports jacket, no shirt, and a plastic cap with a baseball cap over it. He was loitering in the parking lot, appeared to use the area in back of the store as a restroom, pretended to talk on the telephone, and waved at Jones who recognized him as a previous customer.

- After the robbery, the robber ran away. No car was seen. Bibles arrived and saw the robber running away. He identified the man as Nate Lewis whom he knew. Bibles also knew Ward.

- Ward's machine-stamped time card showed he worked the day of the robbery from 6:51 a.m. to 3:16 p.m., and took lunch from 12:04 p.m. to 12:96 p.m.[11]

- Ward was seen by two co-workers, one about 1:00 p.m. and the other about 1:30 p.m.

- The machine next to Ward's happened to break down that day, and co-worker Norvell worked on it from about 1:00 p.m. to about 2:45 p.m. He had to have Ward's assistance periodically during this time.

- It was possible to leave the workplace without permission, but workers doing this often got caught.

- It was about a five-minute drive from Ward's workplace to the convenience store, which does not include the walking time needed to cover the two to

11. See footnote 6.

three hundred yards from the building to the parking lot.

Based on these facts and the eyewitness identification of Ward, the State's theory of the case was this: Ward clocked in from lunch about 1:00 p.m., visited with co-worker Miles about church, and went to his work station where he made contact with co-worker Childers about 1:30 p.m. The machine next to his unexpectedly broke down, and co-worker Norvell was repairing it. Ward took a chance on getting caught and left the work place without permission. He walked two to three hundred yards to his car, took off his shirt, put on a sports jacket and a plastic shower cap with a baseball cap over it, retrieved his gun, and drove to the convenience store. He left his car somewhere away from the store and walked. He arrived at the store about 1:45 p.m. Then he loitered in the parking lot, went behind the store for a restroom break, and pretended to use the telephone while he "cased" Phillips and Bailey—whom he found fortuitously in the parking lot—for a robbery. He also waved at Jones as she arrived for work. About 1:55 p.m., when Phillips was alone, Ward robbed him and then ran back to his car. Ward took off the clothes he had donned just for the robbery, put his shirt back on, and drove back to work. He sneaked back to his work station, arriving about 2:10 p.m. Ward then proceeded to finish the remaining hour of his workday. The State discounts Norvell's testimony as being false.

The following evidence tends to disprove the State's theory and therefore tends to disprove guilt:

- Phillips saw the robber a total of about three seconds under the stress of being robbed at gunpoint, and Bailey saw him a total of fifteen to twenty seconds.
- Jones was a MHMR patient on medication for chronic depression.
- Phillips and Bailey claimed the robber had a mark which at various times they described as either a scar or a mole. Jones, who had the best and longest look, never mentioned any mark, scar, or mole.
- Bibles was the only one of the four eyewitnesses who knew Ward, and he stated the robber, whom he also knew, was not Ward, but "Nate" Lewis. He disputed telling Officer Torres he saw Ward. Investigating officers never attempted to interview Lewis.
- Although denied by Officer January, Bailey testified that January simultaneously showed him and Phillips two six-person photographic lineups.[12] In addition, Jones testified she was shown other pictures before she was shown the lineup with Ward's picture.
- Three co-workers established Ward's presence at work that afternoon, one twenty minutes before the robbery. A fourth, Norvell, placed Ward at work during the exact time of the robbery. Norvell had to be subpoenaed to trial because he did not want to get in-

12. Although the lineup with Lewis's picture was not admitted into evidence, it is in the record. The two lineups January assembled contained the same five people other than Ward and Lewis, and in the middle-center position, one had a picture of Ward and the other a picture of Lewis. Because there was only one face in each lineup which was not in the other, the identification essentially became a choice between Ward and Lewis. The question was: Which of these two old mug shots looks the most like the robber? The flaw in the procedure is obvious. Also, once the witnesses had selected Ward from the first lineup and committed to that picture, the chances are remote that showing any subsequent lineup would yield a different result. In addition, once Ward was identified in the lineup, the identification at trial tended to become automatic.

volved. There was no evidence that any of Ward's four co-workers were personal friends of Ward, or had any other motive to lie.

- Ward's machine-stamped time card placed him at work during the exact time of the robbery.
- Police interviewed eleven co-workers at Ward's workplace who were not able to establish an alibi. However, no one noticed Ward being away from his work station at any time.
- The robber waved at Jones as though he knew her. It seems unlikely Ward would go to the store to commit a robbery, and before doing so deliberately call attention to himself by waving at someone there; however, someone loitering who made a last-minute decision to commit a robbery might.
- There was no physical evidence linking Ward to the robbery.
- There was no evidence of motive, and Ward was gainfully employed.

In reviewing the evidence, we ask whether the proof contrary to guilt greatly outweighs the proof of guilt to the extent that the finding of guilt is clearly wrong and manifestly unjust. *Johnson*, 23 S.W.3d at 11. We find that the probability the events occurred as the State alleges is very low. For one, the time line necessary for Ward to have committed the robbery requires almost split-second timing. Furthermore, a number of events do not make sense, such as why Ward would wave at Jones, and why he would take off his shirt. Also, two of the State's three eyewitnesses observed the robber for only a brief period of time, and the third was under medication for a mental condition. There also was discrepant testimony from these witnesses about a mark on the robber's face. In addition, the photographic lineup procedures used by the police are suspect. Finally, the State put on no physical evidence linking Ward to the crime, and asserted no motive why a hardworking family man would commit the crime.

At the same time, the sizeable evidence contrary to guilt cannot be resolved. The State never effectively challenged Ward's alibi defense, which consisted not only of three witnesses who placed him at work at the time of the robbery, but also of documentary evidence, his machine-stamped time card, which also placed him at work during the robbery, and on which were stamped times which corresponded to the times given by co-workers about when they spoke to Ward at work. This evidence cannot simply be ignored. In addition, there was a plausible alternate suspect, Lewis, whom the police never interviewed, even though an eyewitness specifically identified him as the robber.

Reminded that the jury must have had no reasonable doubt, we find that the evidence taken as a whole is factually insufficient, and the verdict is contrary to the law and the evidence. On this evidence Ward's conviction is clearly wrong and manifestly unjust. Therefore, Ward should have a new trial. Tex.R.App. P. 21.3(h) ("The defendant must be granted a new trial ... when the verdict is contrary to the law and the evidence."); *Tibbs v. Florida*, 457 U.S. 31, 32, 102 S.Ct. 2211, 2213, 72 L.Ed.2d 652 (1982); *Clewis*, 922 S.W.2d at 133–34.

## CONCLUSION

Finding the evidence factually insufficient to support the verdict, we reverse the judgment and remand the cause for a new trial.

Justice GRAY dissenting.

GRAY, Justice, dissenting.

Nathaniel Ward was charged by indictment and found guilty by a jury of the felony offense of aggravated robbery. He was sentenced to forty-five years in prison and given a $2,750 fine. On appeal, Ward complains that (1) the evidence was factually insufficient to establish the offense of aggravated robbery and (2) the trial court erred in failing to grant his motion for mistrial after the prosecutor impermissibly injected facts which were not in evidence during final argument. I would affirm the judgment of the trial court.

ISSUE ONE—FACTUAL SUFFICIENCY

In his first issue, Ward argues that the evidence was factually insufficient to establish the offense of aggravated robbery. When conducting a review of the factual sufficiency of the evidence, we begin with the assumption that the evidence is legally sufficient. *Santellan v. State*, 939 S.W.2d 155, 164 (Tex.Crim.App.1997). We then apply the standard of review set out by the Court of Criminal Appeals in *Johnson. Johnson v. State*, 23 S.W.3d 1 (Tex.Crim. App.2000). We ask "whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the [fact finder's] determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof." *Id.* at 11; *see also Cain v. State*, 958 S.W.2d 404 (Tex.Crim.App.1997); *Clewis v. State*, 922 S.W.2d 126 (Tex.Crim.App.1996). In other words, evidence can be factually insufficient if (1) it is so weak as to be clearly wrong and manifestly unjust or (2) the adverse finding is against the great weight and preponderance of the available evidence. *Johnson*, 23 S.W.3d at 11.

The reviewing court must always remain cognizant of the fact finder's role and unique position, a position that the review-ing court is unable to occupy. *Johnson*, 23 S.W.3d at 9. The jury is the judge of the credibility of the witnesses and may "believe all, some, or none of the testimony." *Chambers v. State*, 805 S.W.2d 459, 461 (Tex.Crim.App.1991). A factual sufficiency analysis can consider only those few matters bearing on credibility that can be fully determined from a cold appellate record. *Id.* at 8. Occasionally this approach permits some credibility assessment but usually requires deference to the jury's conclusion based on matters beyond the scope of the appellate court's legitimate concern. *Id.* (*citing* George E. Dix & Robert O. Dawson, 42 *Texas Practice—Criminal Practice and Procedure* § 36.69 (Supp. 1999)). Thus, unless the available record clearly reveals a different result is appropriate, an appellate court must defer to the jury's determination concerning what weight to give contradictory testimonial evidence because resolution often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered. *Id.*

APPLICABLE LAW—ROBBERY

The offense at issue in this case is aggravated robbery. The elements of robbery are:

1) A person—requiring proof of identity;

2) while in the course of committing theft;

3) with the intent to obtain or maintain control over the property; and

4a) intentionally, knowingly, or recklessly causes bodily injury to another; or

4b) knowingly threatens or places another in fear of imminent bodily injury or death.

*See* TEX. PENAL CODE § 29.02 (Vernon Supp.2001). One method by which the offense is elevated to aggravated robbery

is if the person uses or exhibits a deadly weapon. *See id.* § 29.03(a)(2). A handgun is a deadly weapon per se. *Anderson v. State,* 813 S.W.2d 177, 179 (Tex.App.—Dallas 1991, no pet.). Only the first element, "a person-requiring proof of identity," is challenged by Ward.

EVIDENCE AT TRIAL

A. *State Witnesses*

On September 10, 1998, Daniel Phillips, a driver for Hack Branch Distribution, was delivering beer at Adams Drive–In Store between 1:30 P.M. and 1:45 P.M. when he was robbed. As he was unloading the beer from the truck, the perpetrator approached him from behind and told him to throw his wallet on the ground. Phillips turned around to comply and saw a black male holding a black gun. The perpetrator was wearing a shower cap on his head with a baseball cap on top, a tan blazer, no shirt, and dark slacks. The perpetrator took Phillips's business and personal wallets, which together contained approximately $2,750. Phillips testified that the individual had a distinctive birthmark or scar near the temple area on his face. At trial, Phillips identified Ward and specifically pointed to the mark or scar on the left side of his face.

Joseph Bailey, also a Hack Branch Distribution employee, was with Phillips the day of the robbery. Bailey testified that when they arrived at the convenience store they took five to ten minutes doing paperwork before they began unloading. Then Phillips began stacking the beer by the truck and Bailey carried it in. Shortly after their arrival at the store, Bailey stated that he noticed an odd individual wearing a beige suit jacket with no shirt, in the middle of a hot day, and navy blue slacks. The man was also wearing a discolored plastic shower cap and a brown ball cap. He had a birthmark or scar on his face.

Bailey testified that the individual walked behind the store and urinated. When he finished, he then went to the payphone. The individual held the telephone receiver, but Bailey neither saw the man's lips move nor heard him speak. While Bailey was unloading the beer inside the store, Phillips came in and told him that he had been robbed. Bailey went outside and saw the same person he had seen earlier at the end of the parking lot. At trial, Bailey identified Ward and specifically pointed to the mark or scar on the left side of his face.

Pamela Jones, an Adams Drive In employee, testified that she was walking to work at approximately 1:50 p.m. when she saw a black man wearing a tan sports coat, dark blue or black pants, and a plastic cap with a baseball cap on top. She identified the man she saw fleeing from the store as someone she had seen twice in the store before the day of the robbery. At trial, Jones identified Ward as the person she saw outside the store on the day of the robbery.

B. *Defense Witnesses*

Bryan Bibles testified that on the day of the robbery, he pulled up to the convenience store and saw the beer truck. He then heard Phillips say that he had just been robbed and Bibles turned to see a black male running from the truck. He testified that the perpetrator was wearing an old "straggly" brown coat and something on his head. There is conflicting testimony as to whether or not Bibles identified the perpetrator as "Nathaniel Ward" or just "Nate" while at the robbery scene. The investigating officer testified that Bibles identified the fleeing robber as Nathaniel Ward, but Bibles testified that he only identified the fleeing robber as "Nate." He denies giving the officer the appellant's full name.

After Bibles learned that Ward had been arrested, however, he contacted the detective on the case and told him that they had arrested the wrong person and that the robber was Nathaniel Lewis not Nathaniel Ward. Bibles testified that he knew Nathaniel Lewis as "Nate" because he had attended school with the individual, and he had given Lewis a ride a month and a half earlier. Bibles also knew Nathaniel Ward, having graduated from high school with him, and testified that he was not the person he saw that day. Bibles was shown a photograph line-up during trial, and he identified Nathaniel Lewis as the person he saw the day of the robbery.

Lisa Childers, an employee at Easy Gardener production plant, where the appellant was also employed, testified that she was at work the day of the offense and that she saw Ward there. She stated that she performed a quality check at approximately 1:30 p.m. on Ward's machine and that he was present at that time. Childers also testified that it was possible for employees to say that they were going to the restroom and then leave the building. Ed DeGrate, a manager at Easy Gardener, testified that Ward produced 21 out of the usual 30 boxes the day of the robbery. He attributed the deficiency in the number of boxes produced to machine "down time." DeGrate testified, like Childers, that it was possible for an employee to state that they were going to the restroom and then leave the building. He stated that there were no restrooms in the building where Ward worked.

Easy Gardener's time clock recorded time in hundredths of hours rather than minutes and on military time rather than "A.M." and "P.M." Ward's time card was introduced. It showed that Ward began work at 6:51. The card showed that Ward took his lunch from 12:04 to 12:96 and he left work at 15:16. Gussie Miles, a mail clerk at Easy Gardener, testified that she saw Ward in the break room a little after 1:00 p.m. and that he left the break room at approximately 1:05 or 1:20 p.m.

The plant records also established that there was some "down time" on Ward's machine the day the robbery was committed. Dwayne Norvell, the employee that worked on Ward's machine, testified that he worked on Ward's machine the morning of the offense and after lunch. Norvell worked until approximately 2:30 p.m. that day. He further testified that Ward was working on the machine with him from 1:00 p.m. to 2:30 or 2:35 p.m. According to Norvell, he could not have worked on the machine without Ward there. The machine's conveyor belt was having problems and Norvell testified that he had to have Ward feed material into the machine while he worked on it. While on the stand, Norvell was unable to state specifically the number of times he looked back to see if Ward was feeding the machine. However, he stated that the machine never ran out of material.

C. *State's Rebuttal Evidence*

Officer Johnny R. Torres responded to the robbery scene. Phillips, Bailey, and Jones gave Torres descriptions of the man they had seen, including his race, height, weight, and clothing. He also talked to Bibles. Torres testified that at the scene Bibles identified the man as Nathaniel Ward, a man with whom he had gone to school. Officer Torres then turned this information and the case over to Waco Police Department's Special Crimes Unit.

Steve January, a detective with the Special Crimes Unit, was assigned to the case. Based on Officer Torres' identification of Ward as a suspect, January prepared photographic line-ups containing Ward's picture. A couple of days after the robbery, January showed these line-ups to the eye-

witnesses at separate times. Phillips, Bailey, and Jones all positively identified Ward in the photographic line-up as the perpetrator. The eyewitnesses initialed and dated Ward's photograph to indicate that he was the person they had seen the day of the robbery.

Approximately eleven days after the robbery, Detective January received a telephone call from Bibles. Bibles stated that they had arrested the wrong person. Bibles said that the person he saw at the robbery scene was not Ward, but someone named Nathaniel Lewis. January then prepared another photographic line-up containing a photograph of Lewis. Phillips and Jones were shown the new lineup containing Lewis and they did not identify any photo in this second line-up as the perpetrator. They were then shown an unmarked copy of the original lineup with Ward's photo and they both again identified Ward as the perpetrator. Approximately six weeks after the robbery, Bailey and Phillips gave written statements in which they described Ward. January testified that it took him approximately five minutes to drive from Adams Drive In to the Easy Gardner plant. He stated that he drove the route around the same time of day that the robbery occurred.

APPLICATION

The jury has the responsibility and duty to resolve any inconsistencies in the evidence. The jury was free to find any of the witnesses credible or not credible. The jury could have simply disbelieved Ward's alibi witnesses. A trial court's decision is not manifestly unjust merely because the jury resolved conflicting views of the evidence in favor of the State. *Cain v. State*, 958 S.W.2d 404, 410 (Tex.Crim.App. 1997). Alibi is a factual question. *Ford v. State*, 509 S.W.2d 317, 318 (Tex.Crim.App. 1974). It was within the province of the jury to reject this defensive theory and believe other testimony. *Id.*

Evidence with some element of untrustworthiness is customary grist for the jury's mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature. I am content to rely upon the good sense and judgment of the jury. Here, the verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Johnson v. State*, 23 S.W.3d 1 (Tex.Crim.App.2000). The evidence was factually sufficient to sustain the verdict. Because the majority chooses to inject its ability to weigh the credibility of the witnesses based on factors that are not apparent in the record, I respectfully dissent.

ISSUE TWO—MOTION FOR MISTRIAL

In his second issue, Ward alleges that the trial court committed error in failing to grant his motion for mistrial after the prosecutor impermissibly injected facts which were not in evidence during his final argument. During the final argument on guilt/innocence, the prosecutor made the following statement:

"The only person we have to impeach is Dwayne Norvell. And he is the only one who puts him there at that time. You want to believe Dwayne Norvell because the machine cycled every ten minutes. That means somebody else couldn't have fed that machine? Or does it mean maybe twenty-seven hundred dollars speaks to Dwayne Norvell?"

Defense counsel objected and the trial court sustained the objection. Without request, the trial court instructed the jury to disregard the last statement for any purpose. Ward then moved for a mistrial which was overruled.

Jury arguments are proper if they fall within the following four categories: (1)

summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to the argument of opposing counsel, and (4) plea for law enforcement. *Guidry v. State,* 9 S.W.3d 133, 154 (Tex.Crim.App. 1999). Error occurs when the prosecutor interjects into the argument facts not supported by the record. *Id.*

Nonetheless, when the trial court sustains an objection and grants a request for an instruction for the jury to disregard but denies the motion for mistrial, the issue becomes whether the trial court erred in denying the mistrial. *Carlock v. State,* 8 S.W.3d 717, 723 (Tex.App.—Waco 2000, no pet.); *Faulkner v. State,* 940 S.W.2d 308, 312 (Tex.App.—Fort Worth 1997, pet. ref'd). The trial court's decision is error only if the argument is extreme, manifestly improper, injects new and harmful facts into the case or violates a mandatory statutory provision and was thus so inflammatory that its prejudicial effect cannot be reasonably removed from the minds of the jury by an instruction to disregard. *Carlock,* 8 S.W.3d at 723; *Washington v. State,* 822 S.W.2d 110, 118 (Tex.App.—Waco 1991), *rev'd on other grounds,* 856 S.W.2d 184 (Tex.Crim.App.1993). *See also Trent v. State,* 925 S.W.2d 130, 133 (Tex. App.—Waco 1996, no pet.).

If the instruction cured any prejudicial effect [1] caused by the improper argument, the reviewing court should find that the trial court did not err. *Carlock,* 8 S.W.3d at 723–724. If the instruction did not cure the prejudicial effect, error results, and the reviewing court proceeds with a harm analysis. *Id.* at 724; *Washington,* 822 S.W.2d at 118. Although not expressly adopted as exhaustive or definitive, the Court of Criminal Appeals has relied on

the following factors to determine whether an instruction to disregard cured the prejudicial effect:

1.  The nature of the error;
2.  The persistence of the prosecution in committing the error;
3.  The flagrancy of the violation;
4.  The particular instruction given;
5.  The weight of the incriminating evidence; and
6.  The harm to the accused as measured by the severity of the sentence.

*Veteto v. State,* 8 S.W.3d 805 (Tex.App.—Waco 2000, pet. ref'd).

Applying the foregoing factors to this case, any prejudice caused by the prosecution's argument was immediately cured by the trial court's instruction. The prejudicial effect of the argument was not of such a nature that it could not be cured by an instruction to disregard. The jury was instructed to not consider the prosecution's argument for any purpose. Furthermore, it cannot be argued that the prosecution was persistent in committing the error because the argument was only mentioned once. The argument was not so flagrant or offensive that the timely instruction to disregard did not cure the prejudicial effect, if any. Thus, I conclude that the court's instruction was sufficient. I would overrule Ward's second issue.

CONCLUSION

Having resolved both issues against Ward, I would affirm the judgment of the trial court. Because the majority does not, I respectfully dissent.

---

**1.** The case law uses the term "harm" in this context. Because of the potential confusion with "harm analysis," we decline to use this term. In examining the means for determin- ing error in this situation, we have previously found that the correct term to use is "prejudicial effect" and use it accordingly.