**Opinion filed August 31, 2012**



**In The**

# Eleventh Court of Appeals

_____

**No. 11-10-00371-CR**

_____

### KLENT AARON BURNSIDE, Appellant
### V.
### STATE OF TEXAS, Appellee

**On Appeal from the 42nd District Court**
**Taylor County, Texas**
**Trial Court Cause No. 23707A**

## M E M O R A N D U M   O P I N I O N

Klent Aaron Burnside appeals his conviction by a jury of the offense of aggravated robbery. The trial court assessed his punishment at twelve years in the Texas Department of Criminal Justice, Institutional Division, on each of two counts, with the sentences to run concurrently. He contends in a single issue that the evidence is insufficient to support his conviction. We affirm.

In determining Burnside's claim that the evidence is insufficient to support his conviction, we must determine whether any rational finder of fact could have found the existence of the elements of the offense after viewing all of the evidence in a light most favorable to the verdict. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010); *Gibbs v. State*, 819 S.W.2d 821, 834 (Tex. Crim. App. 1991). It is not our duty to sit as a thirteenth juror reweighing the evidence or deciding whether we believe the

evidence established the elements of the offense in question beyond a reasonable doubt. *Gibbs*, 819 S.W.2d at 834. When we review the evidence where there are facts that support conflicting inferences, we must presume that the finder of fact resolved the conflict in favor of the verdict. We must resolve any inconsistencies in favor of the verdict. *Farris v. State*, 819 S.W.2d 490, 495 (Tex. Crim. App. 1990).

Herschel Thigpen testified that he was working at a convenience store in Abilene at about 6:00 p.m., or shortly thereafter, when Burnside picked up some cookies. He said that, when Burnside went to the counter, Burnside dug around in his pockets and did not have any money to pay for the cookies. Thigpen indicated that the customer behind Burnside presented a twenty-dollar bill to pay for the cookies. Thigpen related that, when the clerk opened the register, Burnside said, "[W]ell, while you have the register open," and then pulled a handgun on the clerks. Thigpen related that Burnside said, "[P]ut your head down and give me all your money out of the register."

Thigpen acknowledged that, after Burnside took the money, everyone told him that they had not seen his face when he asked if they had seen it. Thigpen said that was not really the truth. Thigpen said he described the robber as wearing a goatee and "little longer hair." He acknowledged that the robber was wearing a baseball cap so that he really could not see his hair. Thigpen stated that the robber was wearing a hoodie and was wearing gloves on his hands.

Thigpen testified that he was not able to identify Burnside from a group of photos shown to him by Detective Will Ford of the police department, noting that the pictures were not that great. In court, Thigpen identified Burnside as the robber. He acknowledged that Burnside did not have a beard or goatee and hardly had any hair. He said, "I can look into his eyes and pretty much tell you it was him." He insisted that he would never forget the robber's face.

On cross-examination, Thigpen acknowledged that the pictures Detective Ford showed him were not blurry, but were regular pictures. He acknowledged that he could not see the robber's hair but that he did see the gun. Thigpen said that he looked at the gun, but that, when the robber walked up to the register, he looked up at the robber's face. He acknowledged that he did not mention that in his statement because he was really scared and could not remember what the robber looked like. He admitted that, in his statement, he said he did not get a real good look at the robber's face.

John R. Wilson, a detective with the Abilene Police Department, testified that, at the time of the robbery, he was a patrol officer in the area where it occurred. He went to the scene and talked to the victims. He picked up a package of cookies that he was told the robber had picked up after taking one of his gloves off. He said that he found a ball cap in open view on the driveway outside the store. The victims identified the cap as the one that the robber had on when he robbed them. He acknowledged that one fingerprint was found on the package of cookies that did not belong to Burnside. He said that it would not be uncommon for more than one person's prints to be on the package, which was located in a display next to the register. He also said that the gun used was not found.

On cross-examination, Detective Ford acknowledged that the ball cap did not have Burnside's DNA on it. He clarified that the package of cookies had a number of people's fingerprints on it. He acknowledged that Thigpen told him that he did not get a good look at the robber because he was told not to look, so he did not look. On redirect examination, Detective Ford testified that no one identified anyone other than Burnside as the robber.

Ralph Galvan, a video review officer for the chain of stores that owned the store where the robbery occurred, identified video recorded at the time of the robbery.

Trisha Medina, a second clerk in the store at the time of the robbery, testified concerning the events that occurred. She said that the robber was wearing a leather jacket, dark denim jeans, and a black baseball cap with a green marihuana leaf on the front. She indicated that the robber had a goatee that was not really clean shaven around the sides. She related that his hair stood "a couple inches off" and that he had on big diamond stud earrings. She identified Burnside as the robber. She said he had the cookies in his gloved hand while he was digging for change with his hand from which he had removed a glove.

Medina testified that she was afraid Burnside was going to kill her and her unborn child. She indicated that, after Burnside left, she summoned police and the store manager. She related that, although she told Burnside she had not seen his face, she actually did see it. She insisted she had no doubt that Burnside was the man who robbed her. She said that, although he did not look the same at trial as he did during the robbery, his face, features, nose, eyes, and structure were imprinted in her mind forever—something she would never forget. Medina stated that she looked at about five or six pages of lineup pictures with six pictures to a page and picked out Burnside, without any hesitation.

3

On cross-examination, Medina acknowledged that, in the video, Burnside was wearing a sweater, not a jacket, but she insisted that she could not have been mistaken about whom she really saw. She also acknowledged that the marihuana leaf on the ball cap was black, rather than green. She insisted that, even if she had been mistaken about the jacket and the cap, she was sure about the face.

Medina testified that, when she talked to police originally, she had assumed that Burnside had touched the cookies with the hand from which he had removed his glove. She acknowledged that, after the cookies tested negatively for Burnside's fingerprints, she told Detective Ford that he must have had the cookies in his gloved hand. She also acknowledged that she might have been mistaken about what he looked like because he had a beard. On redirect examination, Medina, who indicated that she had miscarried two weeks after the robbery, again insisted that she would never forget the face that scared her so badly.

Robert Hudson testified that he offered to pay for Burnside's cookies. He indicated that Burnside pulled out a gun when the clerk opened the register. He stated that he was sure Burnside was the robber and that he looked the same except that he had a thin moustache. He later related that Burnside had a goatee, rather than a thin moustache. He noted that he had identified Burnside from a one-page photo lineup. He insisted he had no problem picking out Burnside. Hudson indicated that Burnside was wearing a glove on his hand when he put the cookies down on the counter. On cross-examination, Hudson stated that Burnside had on a jacket.

Will Ford testified that he is a detective with the Abilene Police Department. He said he presented photo lineups to the witnesses in this case. He indicated that, without any problem at all, Medina identified Burnside as the suspect in the robbery. He noted that he did not disclose to Hudson whom Medina had identified.

Detective Ford testified that Hudson identified Burnside from a photo lineup with a different photo of Burnside than the one Medina had identified. He indicated that Hudson also had no problem identifying Burnside. He said that, even though the fingerprint on the cookie package did not match Burnside, it was very common for people to touch products in a convenience store. He said he was aware that Medina had indicated that the robber was wearing a jacket and a cap with a green marihuana leaf on it. He acknowledged that a jacket was never found, that there was no green marihuana leaf on the cap, and that the only DNA found on the

4

cap was that of someone other than Burnside. He also acknowledged that no check was done to see if Burnside had a weapon registered to him and that Thigpen could not pick out anyone. The State rested after David A. Seitz, the manager of the convenience store, testified that, after the robbery, the store was missing $99.34 out of its receipts.

Burnside testified that, at the time of the robbery, he was traveling from Abilene to Eula, Texas, with his friend Theodore Thompson; his girlfriend at the time, Heather Rhodes; and Sharee and Ashley, two friends. He indicated that they arrived at Sharee and Ashley's home in Eula at about 6:30 p.m. or 7:00 p.m. He estimated the driving time from Abilene to Eula to be about one hour and something. We take judicial notice that Eula is sixteen miles from Abilene and that the driving time for that distance is about twenty-two minutes. He indicated that they made the trip in a white Tahoe driven by Thompson. He said he was not aware that the robber left the convenience store in an unidentified Tahoe. Burnside acknowledged that he spoke with Detective Ford but never told him where he was at the time of the robbery. He further acknowledged that he had never met any of the witnesses before.

Heather Starlene Rhodes testified that Burnside was her boyfriend, that they were living together at the time of the robbery, and that she was with him every day. She said that she recalled going to Eula with Burnside, but could not remember the exact date. She stated that, if Burnside said it was the date of the robbery, that would be correct. She insisted that Burnside had no clothing matching that worn by the robber in the video of the robbery.

On cross-examination, Rhodes denied telling Detective Ford that Burnside would not tell her about his personal business but would just tell her that he was going to "hit a lick" and be back later. She acknowledged that she was in custody for possession of cocaine with intent to deliver and had also been convicted for a federal offense of possession of marihuana.

Detective Ford testified that Rhodes did not tell him she was with Burnside every day and every night in December. According to Detective Ford, she told him that she knew Burnside was doing robberies but that he would not specify who or what he was robbing. Detective Ford said Rhodes told him that Burnside would say he was going to go "hit a lick" but would never say "where or who." He indicated that "hit a lick" was street slang for "go and rob someone." Detective Ford testified that he had known Burnside before this investigation and that Burnside was not trustworthy at all.

5

Although he had indicated on redirect examination that he had never shown Rhodes the video of the robbery, on recross examination, Detective Ford acknowledged that he might have shown it to her. Detective Ford acknowledged that "hit a lick" could also mean to sell dope. On redirect examination, he denied that Rhodes had ever told him that Burnside did not commit the robbery, although he had given her the opportunity to do so. Medina, when recalled as a witness, testified that, although she might be wrong about some details, she had no doubt at all about her identification of Burnside because she would never forget his face. We hold that the evidence is sufficient to support the conviction.

Burnside relies heavily on the opinion in *Ward v. State*, 48 S.W.3d 383 (Tex. App.—Waco 2001, pet. ref'd). We find that case to be distinguishable. First, in *Ward*, several of the defendant's coworkers testified that he was at work at the time the offense was committed. 48 S.W.3d at 390. The State never effectively challenged Ward's alibi in that case, whereas both Burnside's and Rhodes's testimony was strongly challenged in the trial of this case. *Id.* at 391. We also note that the opinion in *Ward* that the evidence was insufficient was one based upon a claim that the evidence was factually insufficient, using a standard of review that is no longer applicable. *Id.*; *see Brooks*, 323 S.W.3d at 912.

Burnside appears to contend that we should rely on *Ward*, despite the fact that it used the factual review standard as set forth in *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996), because, in *Brooks*, the Texas Court of Criminal Appeals said that there was no meaningful distinction between the two standards. *See Brooks*, 323 S.W.3d at 895. We have applied the standard as set out by the Court of Criminal Appeals in *Brooks* as the "only" appropriate standard of review. *See id.* at 895, 912. We overrule Burnside's sole issue.

The judgment of the trial court is affirmed.


PER CURIAM

August 31, 2012

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Hill.[1]

---

[1]John G. Hill, Former Chief Justice, Court of Appeals, 2nd District of Texas at Fort Worth, sitting by assignment.