Anthony D. Williams v. State ofTexas
















IN THE
TENTH COURT OF APPEALS
 

No. 10-99-252-CR

     NATHANIEL WARD,
                                                                         Appellant
     v.

     THE STATE OF TEXAS,
                                                                         Appellee
 

From the 54th District Court
McLennan County, Texas
Trial Court # 98-923-C
                                                                                                                
                                                                                                         
O P I N I O N
                                                                                                                

      Nathaniel Ward was sentenced to forty-five years in prison after a jury trial for aggravated
robbery. Three eyewitnesses identified him as the robber. However, a fourth eyewitness
identified someone else, and four co-workers testified that Ward was at work on the day of the
robbery. Ward asserts on appeal that the evidence is factually insufficient to sustain the
conviction.


 Finding that the proof of guilt is so greatly outweighed by contrary evidence as to
be clearly wrong and unjust, we will reverse the judgment and remand the cause for a new trial.
FACTUAL AND PROCEDURAL BACKGROUND
      Around 1:00 or 1:30 p.m., delivery-truck drivers Daniel Phillips and Joseph Bailey arrived
at a convenience store to deliver beer. (Phillips testified 1:30, and Bailey testified 1:00.) Within
ten minutes Bailey noticed a black male outside the store who was wearing a tan sports coat with
no shirt, dark pants, and a plastic cap on his head with a baseball cap over it. Bailey later
described the man as weighing about 110 pounds. At one point the man appeared to be using the
area behind the store as a restroom. Then the man apparently pretended to use the outside
telephone, because Bailey observed him holding the receiver but not talking. Bailey observed the
man up close a total of fifteen to twenty seconds as Bailey went in and out of the store with beer. 
About 1:50 p.m., Pamela Jones, a patient of Mental Health and Mental Retardation (“MHMR”)
who worked at the store,


 arrived for her shift and also saw the black male. He was standing at
the telephone, and he waved at her. She had seen him in the store twice before. She said she
stopped and stared at him because he was wearing a sports coat on a hot day, and had on a plastic
cap with a baseball cap over it. Once Phillips was alone in the parking lot, the black male, whom
Phillips had not previously noticed, approached Phillips from behind and robbed him at gunpoint,
taking twenty-seven hundred and fifty dollars. Phillips saw the man for three seconds, part of
which was spent looking at the gun. He accurately described the man’s clothing, and said the man
weighed about 160 pounds.
      The robber left the scene on foot. While he was leaving, customer Bryan Bibles pulled up
in his vehicle. Bibles was an Army veteran who worked out of the Veterans Hospital as a National
Service Officer for disabled veterans. Bibles testified he saw a man running away from the store. 
The man was wearing a scraggly brown coat, and had on a knit cap over an Afro hair style. 
Bibles testified he recognized the man to be someone he knew as “Nate” with whom he went to
high school. He did not know the man’s last name, although “Nate” was later identified to him
as Nathaniel Lewis. Bibles had given Lewis a ride a month and a half earlier and dropped him
off where he believed Lewis lived, a few streets from the convenience store where the robbery
occurred. Bibles testified he told police he saw “Nate” running from the store. He also told
police of another store where Lewis often hung out. Bibles would see Lewis there, and Lewis
would ask for money to buy beer. By coincidence, Bibles also knew Ward with whom he also
went to high school, but whom he had seen only two or three times in the last several years. 
When Bibles read in the paper Ward had been arrested, he called police to inform them they had
the wrong man. Bibles testified at trial that Ward was not the man he saw at the scene of the
robbery. 
      When Officer Torres arrived at the scene, he somehow came up with Ward’s name as the
robber. Torres testified Bibles told him Bibles saw Ward running from the scene. Bibles testified
he told Torres he saw “Nate” running from the scene, meaning Nathaniel Lewis.


 
      Officer January put together a photographic lineup with Ward’s picture,


 and after Bibles’s
call, he put together a second lineup by simply substituting Lewis’s picture for Ward’s. January
showed the lineup with Ward’s picture to Phillips, Bailey, and Jones, who selected Ward. He
testified he later showed the lineup with Lewis’s picture to only Phillips and Jones who did not
select anyone. However, Bailey testified that January showed him and Phillips two separate
lineups at the same time, four days after the robbery. January contradicted Bailey’s testimony,
claiming that there was an eleven-day interval between showings. Jones testified she was
awakened by January four days after the robbery. She said: He “showed me some pictures. . .
. He said do I see the person, and I say, yes, sir. And I pointed. And he showed me some other
different kind of pictures, different, row after row. He asked me do I see him, and I say yes, sir. 
Can you point him out. I say yes, sir. I say yes, sir. Can you sign and date it. I say yes, sir. 
And I went back to sleep.” 
      These three witnesses also identified Ward at trial. Phillips and Bailey emphasized a small
mark on Ward’s left temple. Both omitted this detail from their written statements to police. In
their interviews with police, they sometimes described the mark as a scar and sometimes as a
mole.


 Jones, who got the best and longest look at the robber, never mentioned the mark.
                                  Four of Ward’s co-workers testified at trial that he was at work on the day of the robbery. 
None of them were friends or relatives of his. Ed Degrate, the supervisor, sponsored Ward’s time
card which was admitted into evidence to show Ward worked from 6:51 a.m. to 3:16 p.m., and
took lunch from 12:04 p.m. to 12:96 p.m.


 Degrate said the parking lot where Ward parked was
two or three hundred yards from the building. He also said workers who tried to sneak out during
the work day often got caught. Gussie Miles saw Ward finishing his lunch in the break room
around 1:00 p.m. They had a brief conversation about a revival going on at her church, and Ward
said he wanted to attend. Lisa Childers performed a quality check of materials at Ward’s work
station about 1:30 and Ward was there. She wrote the time down on a record sheet. Dwayne
Norvell, who had to be subpoenaed by the defense because he did not want to get involved, was
a machine repairman at Ward’s workplace. He testified that between 1:00 and 2:45 he repaired
the machine next to the one Ward operated everyday, and that Ward assisted him during the entire
time by periodically sending items down a conveyor belt between the machines; the items were
wrapped by the machine Norvell was working on. He and Ward were ten to fifteen feet apart.


 
Finally, there was testimony that it would take at least five minutes for a person at Ward’s
workplace to drive to the convenience store. 
      The jury found Ward guilty. At punishment the jury learned that Ward, in his late thirties,
had been married for ten years and had three children — one in elementary school, a second about
to graduate high school, and a third about to begin college. His wife was a case worker with
MHMR and also attended college. Ward was convicted in 1986 on felony charges of cocaine and
marijuana possession, for which he served concurrent two-year sentences. Since his release he
had been employed full-time, sometimes working two jobs. When arrested for this robbery, he
was in possession of a small amount of marijuana. The jury assessed punishment at forty-five
years in prison.
STANDARD OF REVIEW
      The standard of review for a factual sufficiency claim, which is derived from Clewis v. State,
922 S.W.2d 126 (Tex. Crim. App. 1996),


 is set forth in Johnson v. State, 23 S.W.3d 1 (Tex.
Crim. App. 2000).


 The reviewing court “asks whether a neutral review of all the evidence, both
for and against the finding, demonstrates that the proof of guilt is so obviously weak as to
undermine confidence in the jury’s determination, or the proof of guilt, although adequate if taken
alone, is greatly outweighed by contrary proof” “to the extent that the [finding of guilt] is clearly
wrong and manifestly unjust.” Id. at 11. The court does not view the evidence through the prism
of “in the light most favorable to the prosecution.” Johnson, 23 S.W.3d at 7 (quoting Clewis, 922
S.W.2d at 129). “The court reviews the evidence weighed by the jury that tends to prove the
existence of the elemental fact in dispute and compares it with the evidence that tends to disprove
that fact.” Johnson, 23 S.W.3d at 7 (quoting Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim.
App. 1996)). The appellate court “does not indulge in inferences or confine its view to evidence
favoring one side of the case. Rather, it looks at all the evidence on both sides and then makes
a predominantly intuitive judgment. . . . “ Johnson, 23 S.W.3d at 7 (quoting William Powers and
Jack Ratliff, Another Look at “No Evidence” and “Insufficient Evidence,” 69 Tex. L. Rev. 515,
519 (1991)). “In conducting its factual sufficiency review, an appellate court reviews the fact
finder’s weighing of the evidence and is authorized to disagree with the fact finder’s
determination.” Johnson, 23 S.W.3d at 7 (quoting Clewis, 922 S.W.2d at 133). 
      A review of a claim of factual insufficiency of the evidence requires an understanding of the
applicable burden of proof at trial. The Supreme Court considered “proof beyond a reasonable
doubt” in In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The Court for
the first time held explicitly that the Fourteenth Amendment Due Process Clause of the United
States Constitution “protects the accused [in a criminal case] against conviction except upon proof
beyond a reasonable doubt of every fact necessary to constitute the crime with which he is
charged.” Id., 397 U.S. at 364, 90 S.Ct. at 1073. The Court described proof beyond a
reasonable doubt as “a prime instrument for reducing the risk of convictions resting on factual
error.” Id., 397 U.S. at 363, 90 S.Ct. at 1072. “A person accused of a crime . . . would be at
a severe disadvantage, a disadvantage amounting to a lack of fundamental fairness, if he could be
adjudged guilty and imprisoned for years on the strength of the same evidence as would suffice
in a civil case.” Id., 397 U.S. at 363, 90 S.Ct. at 1072 (quoting In the Matter of Samuel W. v.
Family Court, 24 N.Y.2d 196, 205, 299 N.Y.S. 414, 422, 247 N.E.2d 253, 259 (1969)). In the
more general context of protecting the interests of society, the Court said: “It is also important in
our free society that every individual going about his ordinary affairs have confidence that his
government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder
of his guilt with utmost certainty.” In re Winship, 397 U.S. at 364, 90 S.Ct. at 1073.



      In conducting our review, we acknowledge the general rule that typically the credibility of the
witnesses, the weight to be given their testimony, and the resolution of conflicts in their testimony
are questions left to the discretion of the jury. Johnson, 23 S.W.3d at 7; Tex. Code Crim. Proc.
Ann. arts. 36.13, 38.04 (Vernon 1981 and 1979). The rule makes sense in many instances,
because we cannot evaluate certain matters from a cold record, e.g., a witness’s demeanor or voice
inflection, and because our role in a non-de novo review is not simply to substitute our opinion
for the jury’s as though we were the trial jury. However, we are not barred from considering
these issues. See Johnson, 23 S.W.3d at 8. If we were, our right and obligation as the
constitutional guardian against convictions based on factually insufficient evidence would be
nullified. When there is a basis in the record from which we can fairly evaluate credibility and
the weight of evidence, and resolve conflicts in testimony, that evaluation is within our purview. 
“Documents or objective evidence may contradict the witness’ story; or the story itself may be so
internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. 
Where such factors are present, the court of appeals may well find clear error even in a finding
purportedly based on a credibility determination.” Whitsey v. State, 796 S.W.2d 707, 722 (Tex.
Crim. App. 1989) (on rehearing) (quoting Anderson v. Bessemer City, 470 U.S. 564, 575-76, 105
S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985)).
APPLICATION
      The issue is identity. The State’s case relies entirely on three eyewitnesses who identified
Ward from a photographic lineup as the robber, and who also identified Ward at trial. However,
our obligation is to consider in a neutral light all the evidence both for and against the conviction. 
If the evidence that tends to disprove guilt overwhelms the evidence that tends to prove guilt, then
the conviction is clearly wrong and unjust and must be set aside.
      In conducting our review, we are cognizant of our duty to “detail the evidence relative to the
issue in consideration and clearly state why the jury’s finding is factually insufficient,” and to
“state in what regard the contrary evidence greatly outweighs the evidence in support of the
verdict.” Johnson, 23 S.W.3d at 7 (citing Clewis, 922 S.W.2d at 135).
      From the testimony and documentary evidence at trial, the following facts are not reasonably
in dispute:•Between approximately 1:30 p.m. and 2:00 p.m. Phillips and Bailey were delivering beer
to the convenience store. (Bailey moves the time back thirty minutes, testifying they
arrived about 1:00 p.m., and that he first saw the robber about 1:10.)
      •    Jones arrived about 1:50 p.m., and within a few minutes the robbery occurred. Only
Phillips was in the parking lot and experienced the robbery.
      •    The robber was a black male wearing a tan sports jacket, no shirt, and a plastic cap with
a baseball cap over it. He was loitering in the parking lot, appeared to use the area in
back of the store as a restroom, pretended to talk on the telephone, and waved at Jones
who recognized him as a previous customer.
      •    After the robbery, the robber ran away. No car was seen. Bibles arrived and saw the
robber running away. He identified the man as Nate Lewis whom he knew. Bibles also
knew Ward.
      •    Ward’s machine-stamped time card showed he worked the day of the robbery from 6:51
a.m. to 3:16 p.m., and took lunch from 12:04 p.m. to 12:96 p.m.


 
      •    Ward was seen by two co-workers, one about 1:00 p.m. and the other about 1:30 p.m. 
      •    The machine next to Ward’s happened to break down that day, and co-worker Norvell
worked on it from about 1:00 p.m. to about 2:45 p.m. He had to have Ward’s assistance
periodically during this time.
      •    It was possible to leave the workplace without permission, but workers doing this often
got caught.
      •    It was about a five-minute drive from Ward’s workplace to the convenience store, which
does not include the walking time needed to cover the two to three hundred yards from
the building to the parking lot.      
      Based on these facts and the eyewitness identification of Ward, the State’s theory of the case
was this: Ward clocked in from lunch about 1:00 p.m., visited with co-worker Miles about
church, and went to his work station where he made contact with co-worker Childers about 1:30
p.m. The machine next to his unexpectedly broke down, and co-worker Norvell was repairing
it. Ward took a chance on getting caught and left the work place without permission. He walked
two to three hundred yards to his car, took off his shirt, put on a sports jacket and a plastic shower
cap with a baseball cap over it, retrieved his gun, and drove to the convenience store. He left his
car somewhere away from the store and walked. He arrived at the store about 1:45 p.m. Then
he loitered in the parking lot, went behind the store for a restroom break, and pretended to use the
telephone while he “cased” Phillips and Bailey — whom he found fortuitously in the parking lot
— for a robbery. He also waved at Jones as she arrived for work. About 1:55 p.m., when
Phillips was alone, Ward robbed him and then ran back to his car. Ward took off the clothes he
had donned just for the robbery, put his shirt back on, and drove back to work. He sneaked back
to his work station, arriving about 2:10 p.m. Ward then proceeded to finish the remaining hour
of his workday. The State discounts Norvell’s testimony as being false.
      The following evidence tends to disprove the State’s theory and therefore tends to disprove
guilt:
      •    Phillips saw the robber a total of about three seconds under the stress of being robbed at
gunpoint, and Bailey saw him a total of fifteen to twenty seconds.
      •    Jones was a MHMR patient on medication for chronic depression.
      •    Phillips and Bailey claimed the robber had a mark which at various times they described
as either a scar or a mole. Jones, who had the best and longest look, never mentioned
any mark, scar, or mole. 
      •    Bibles was the only one of the four eyewitnesses who knew Ward, and he stated the
robber, whom he also knew, was not Ward, but “Nate” Lewis. He disputed telling
Officer Torres he saw Ward. Investigating officers never attempted to interview Lewis.
      •    Although denied by Officer January, Bailey testified that January simultaneously showed
him and Phillips two six-person photographic lineups.


 In addition, Jones testified she
was shown other pictures before she was shown the lineup with Ward’s picture. 
      •    Three co-workers established Ward’s presence at work that afternoon, one twenty
minutes before the robbery. A fourth, Norvell, placed Ward at work during the exact
time of the robbery. Norvell had to be subpoenaed to trial because he did not want to get
involved. There was no evidence that any of Ward’s four co-workers were personal
friends of Ward, or had any other motive to lie. 
      •    Ward’s machine-stamped time card placed him at work during the exact time of the
robbery. 
      •    Police interviewed eleven co-workers at Ward’s workplace who were not able to establish
an alibi. However, no one noticed Ward being away from his work station at any time.
      •    The robber waved at Jones as though he knew her. It seems unlikely Ward would go to
the store to commit a robbery, and before doing so deliberately call attention to himself
by waving at someone there; however, someone loitering who made a last-minute
decision to commit a robbery might.
      •    There was no physical evidence linking Ward to the robbery. 
      •    There was no evidence of motive, and Ward was gainfully employed.
      In reviewing the evidence, we ask whether the proof contrary to guilt greatly outweighs the
proof of guilt to the extent that the finding of guilt is clearly wrong and manifestly unjust. 
Johnson, 23S.W.3d at 11. We find that the probability the events occurred as the State alleges
is very low. For one, the time line necessary for Ward to have committed the robbery requires
almost split-second timing. Furthermore, a number of events do not make sense, such as why
Ward would wave at Jones, and why he would take off his shirt. Also, two of the State’s three
eyewitnesses observed the robber for only a brief period of time, and the third was under
medication for a mental condition. There also was discrepant testimony from these witnesses
about a mark on the robber’s face. In addition, the photographic lineup procedures used by the
police are suspect. Finally, the State put on no physical evidence linking Ward to the crime, and
asserted no motive why a hard-working family man would commit the crime. 
      At the same time, the sizeable evidence contrary to guilt cannot be resolved. The State never
effectively challenged Ward’s alibi defense, which consisted not only of three witnesses who
placed him at work at the time of the robbery, but also of documentary evidence, his machine-stamped time card, which also placed him at work during the robbery, and on which were stamped
times which corresponded to the times given by co-workers about when they spoke to Ward at
work. This evidence cannot simply be ignored. In addition, there was a plausible alternate
suspect, Lewis, whom the police never interviewed, even though an eyewitness specifically
identified him as the robber. 
      Reminded that the jury must have had no reasonable doubt, we find that the evidence taken
as a whole is factually insufficient, and the verdict is contrary to the law and the evidence. On this
evidence Ward’s conviction is clearly wrong and manifestly unjust. Therefore, Ward should have
a new trial. Tex. R. App. P. 21.3(h) (“The defendant must be granted a new trial . . . when the
verdict is contrary to the law and the evidence.”); Tibbs v. Florida, 457 U.S. 31, 32, 102 S.Ct.
2211, 2213, 72 L.Ed.2d 652 (1982); Clewis, 922 S.W.2d at 133-34.
CONCLUSION
      Finding the evidence factually insufficient to support the verdict, we reverse the judgment and
remand the cause for a new trial.
 
                                                                   BILL VANCE
                                                                   Justice

Before Chief Justice Davis,
      Justice Vance, and
      Justice Gray
      (Justice Gray Dissenting)
Reversed and remanded
Opinion delivered and filed May 23, 2001
Publish



 serif">LIDE: No, we didn't call the pawn shop. We just know what they're worth.
Current offered the testimony of Joe Frerich, an auctioneer who has experience selling property
like that stolen in this case. Frerich testified about different methods of establishing the value of
property. These methods included determining values from the sale of property at pawn shops,
garage sales, pre-used shops, and auctions. Frerich indicated that the most effective would be the
auction method. The pertinent portion of Frerich's testimony is as follows:
DEFENSE COUNSEL: And how do you establish values in the auction method?
FRERICH: You establish value when you bring individuals to an auction where
you have, under no-stress conditions, where a willing seller is willing to sell and
a willing buyer is willing to buy, and there are no-stress conditions. And that's
where you establish the value when you put it on the auction block. And it would
be one of the most effective ways to establish a value.
DEFENSE COUNSEL: Okay. And what sorts of percentage, as compared to new
value, would one be able to get at auction value?
FRERICH: Okay. There's a lot of circumstances there. Depends on how well the
auctioneer has done his advertising; if he's produced brochures that identify the
properties in the best manner. If he's done a wide mail-out that actually is mailed
directly to the auction-oriented people that are interested in that particular item. 
So that has a lot of difference, a lot of variances in the value.
DEFENSE COUNSEL: Let's assume, then, for purposes of what we want to write
down on this board, that the auctioneer has done an adequate job of mailing out to
the folks who might be interested in these products, and he's done it. He's set
forth the items that are going to be sold, and he's done it in a timely fashion so
that, if they choose to attend, they can. Can you give me a range as to percentage
of new value?
FRERICH: Anywhere from 50 to 70 percent.
. . .
DEFENSE COUNSEL: What I'm going to ask you for is: First of all, have you,
in you prior preparation for trial today, have you had occasion to go through and
establish what new value, 100 percent value, is as to each of these items?
FRERICH: Yes, sir, I have on the majority of these that I had.
DEFENSE COUNSEL: And what sources did you go to establish that?
FRERICH: Well, we've used -- I have a book called the Granger Book, and I've
got another one -- another book here that indicates value, new values, which is an
AMWAY book, and pretty well goes from A to Z.
. . .
DEFENSE COUNSEL: What did you do, in the event that you didn't know a
brand name? Certainly, some of the items the witnesses weren't able to recall the
brand. How did you establish value in the case where you had an item that no
brand name was given?
FRERICH: Well, on the hand tools and the industrial-type tools, the Granger Book
had several different types of brands in there. So I just used that as a guideline to
establish value from the different brands.
What I done was I took -- They might have had two or three different kinds,
and I took the three and appraised it out, and divided it, and took an average value
of new value of those particular items.
DEFENSE COUNSEL: Okay. Now, you're going to give us a new value, and
then you're going to give us another value. Which of these values are you going
to give us?
FRERICH: I'm going to use the auction method.
. . .
DEFENSE COUNSEL: My calculations, based on the numbers that we have here,
total out to $51,993.
FRERICH: Pretty close.
DEFENSE COUNSEL: Now, what new adjustments need to be made based on
what you've heard at trial?
FRERICH: Sir?
DEFENSE COUNSEL: We'll go through each one, if you want to do it that way.
FRERICH: I tell you what I did. After listening to two days here and listening to
all the testimony on their particular items and how they described it to be -- Again,
I have not seen any of the merchandise personally, just from the list that I was
provided.
What I've done is, listening carefully, as much as I could hear back there,
I randomly took and added about 20 percent and added to it, which would be an
additional $10,000. I round it off to $10,000.
. . .
DEFENSE COUNSEL: So you added $10,000 total to all nine of the alleged
victims; and so, if I added 10,000 here to the 993, or the 51,993, after having
heard all the testimony, that would reflect what you consider to be the auction value
of all the items listed in the indictment, is that correct?
FRERICH: That could be true. Again, I have not seen any of the merchandise. 
I've not seen any of the photographs, just from this printout that I have. It could
be more and, then, it could be less. One way or the other; works both ways.
DEFENSE COUNSEL: But based on the limited information that you've been
given and what you've heard at trial, you feel like that's an accurate number?
FRERICH: I would feel real confident in that, yes, sir, from the past experiences
that I've had.
. . .
PROSECUTOR: I asked you, where did you find the Garcia rod and reel?
FRERICH: I did use an estimated value.
PROSECUTOR: You just pulled it out of the air, didn't you?
FRERICH: No, sir.
PROSECUTOR: Where did you get it?
FRERICH: From AMWAY.
PROSECUTOR: AMWAY. Let's look. How about Bass Pro Shop? Have you
ever heard of that?
FRERICH: Sir?
PROSECUTOR: Have you ever heard of Bass Pro Shop?
FRERICH: Yes.
PROSECUTOR: Largest tackle store in the nation?
FRERICH: Yes.
PROSECUTOR: Could be the cheapest.
FRERICH: Could be.
PROSECUTOR: I want to show you the Garcia rods, and I want you to tell me
which one you can get me for $30, because I want to place an order. There's Abu
Garcia. How much are they?
FRERICH: Well, you have your $54.
PROSECUTOR: You have what now?
FRERICH: What I see is $54.
PROSECUTOR: Down? Do you find anything? Looks to me like it's 64. Isn't
it 90?
FRERICH: You're not trying to tell me --
PROSECUTOR: No, I just want you to know. How much did you get? Which
one of those rods did you use?
FRERICH: Well, on this particular --
PROSECUTOR: You pulled it out of the air.
FRERICH: On this particular -- Well, particularly this particular bunch, yes,
because of the amount of time.
. . .
PROSECUTOR: You pulled those out of the air.
FRERICH: The amount of time that was given to me to spend --
PROSECUTOR: I didn't ask you about amounts of time. Where did you get those
figures is what I'm asking. You pulled those figures out of the air.
FRERICH: Okay.
. . .
PROSECUTOR: How about a tackle box, $10. Where did you get that?
FRERICH: You know, when you don't have any pictures to go by --
PROSECUTOR: I didn't ask you about that. I asked you where you got the $10
figure, sir.
          FRERICH: I just pulled it out of the air on that particular item.
PROSECUTOR: Okay. Are you aware tackle boxes in the Bass Pro Shop what
they're worth?
FRERICH: I'm sure they're worth more than that.
PROSECUTOR: All right. If they're filled with lures and so forth, they're worth
a lot more than that.
FRERICH: I didn't know if they were or not.
PROSECUTOR: I see. Did you come -- You were appointed as investigator by
the Court to help the defense.
FRERICH: I was appointed as an appraiser.
PROSECUTOR: As an appraiser? Okay. Did you ever contact me?
FRERICH: I wasn't asked to.
PROSECUTOR: Okay. Did you ever contact the victims and look at the stuff?
FRERICH: Never was made aware to me, sir. They was [sic] made where I could
go looking.
PROSECUTOR: In other words, what you did was you took a list and went
through Granger.
FRERICH: Exactly. I took this list --
PROSECUTOR: And pulled a bunch of it out of the air and wrote a bunch of
figures down.
FRERICH: I wouldn't say a bunch.
. . . 
PROSECUTOR: Did you get it right?
FRERICH: According to your facts and figures, what you have there on black and
white on that particular item, I guess I didn't, sir.
PROSECUTOR: Okay. According to my figures.
FRERICH: Yes.
PROSECUTOR: Could you give us your figures on it where you got it? Give us
your figures.
FRERICH: I already made the statement that you said I pulled it out of the air.
. . .
PROSECUTOR: Two tool boxes, $50.
FRERICH: Sir, I don't know how big they are or how small they are. I just put,
you know -- Which one are we on?
PROSECUTOR: The last, J.T.M.
FRERICH: Small toolbox, 50 bucks I figured you can buy. I didn't realize
anything as far as big, small.
PROSECUTOR: Where did you get that? You just pulled it out of the air?
FRERICH: Pulled it out of the air.
PROSECUTOR: All right. Would you be surprised to know those are $600
apiece?
FRERICH: Probably so.
. . . 
DEFENSE COUNSEL: How about the -- says two typewriters. All right. Where
did you get your two typewriters?
FRERICH: I didn't find that one right there. I just put down -- I assumed that
those were good typewriters, new, and I put them as a value of $800 on them two,
$400 apiece.
. . .
PROSECUTOR: Let me make sure I understood that last statement. You pulled
the typewriter out of the air too. Is that what you're saying?
FRERICH: Sir?
PROSECUTOR: Did you pull the typewriter prices out of the air also?
FRERICH: I just established an opinion on that, yes, sir.
. . .
DEFENSE COUNSEL: Is it your opinion, Mr. Frerich, that more often than not
it's been your experience that the fair market value is usually between 50 and 70
percent of the replacement value?
FRERICH: As an average, from the past experiences that I've had, and auctions
that I've conducted, that is a fair market value: 50 to 70 percent. Again, Mr.
Cantrell asked me a question about some will bring more; but, then again, some
will bring less.
The record illustrates several instances, other than those set forth above, when Frerich made
assumptions about the items stolen.
          Because the owners of stolen property may testify as to the fair market value either in terms
of the purchase price or, under appropriate circumstances, the replacement cost, we find their
testimony sufficient to establish a total value of over $100,000. Tex. Penal Code Ann. §
31.08(a); Scott, 741 S.W.2d at 437; Sullivan, 701 S.W.2d at 909; Jones, 814 S.W.2d at 803. 
Current offered controverting evidence of the stolen properties' fair market value by establishing
an auction value of $61,993 through Frerich's testimony. After reviewing the record, we cannot
say that the jury's acceptance of the owners' testimony regarding fair market value over Frerich's
was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. 
Clewis, 922 S.W.2d at 129; Brumbalow, 933 S.W.2d at 299-300. Therefore, we overrule his
second point of error.
          In his third point, Current repeats his complaint that the trial court erred in charging the
jury that it could find him guilty of theft over $100,000 but under $200,000 because a significant
amount of the property alleged to have been stolen was not sufficiently identified. The thrust of
Current's complaint is that the items stolen from J.T.M. Industries were not introduced into
evidence. Furthermore, the only photographs of the stolen property from J.T.M. Industries
consisted of a charger and recovery system, two employee's uniforms, and a survey pole. Current
contends that the trial court should not have allowed the unidentified property to be considered in
ascertaining the value. Gregory Perkins, area manager for J.T.M. Industries, testified that the
items listed in the indictment had been stolen from the J.T.M. Industries' premises. Moreover,
Perkins testified that he and some other J.T.M. Industries workers retrieved some of the stolen
property from the police. The State also produced the testimony of the police officers who seized
the property from Current's control and returned it to J.T.M. Industries after their workers
identified it. In fact, some of the property recovered from Current contained a "J.T.M."
inscription. We find this evidence sufficient to establish the identity of the property stolen from
J.T.M. Industries. See Christopher v. State, 833 S.W.2d 526, 528 (Tex. Crim. App. 1992);
Nickerson v. State, 810 S.W.2d 398, 399-401 (Tex. Crim. App. 1991); Snider v. State, 681
S.W.2d 60, 64 (Tex. Crim. App. 1984).


 Therefore, we overrule Current's third point. 
          Current's fourth point alleges the trial court erred in allowing the State to introduce
evidence regarding the theft of property not listed in the indictment. The State responds that there
is no evidence the jury ever considered these items in reaching its verdict. Additionally, the
property not listed in the indictment was not necessary to calculate the $100,000 amount. Initially,
we must determine what complaint Current attempts to raise by his point. Nowhere in the record
does Current object to the introduction of this property as an extraneous offense or under Rule
403. Tex. R. Crim. Evid. 403. It appears his complaint is that property not listed in the
indictment, but about which testimony was offered, was used by the jury to reach the $100,000
plateau. Thus, we will limit our analysis to whether any error resulted in allowing this testimony
in view of Current's complaint concerning only the valuation issue.
          The purpose of an indictment is to "give the defendant notice of the particular offense with
which he is charged, and enable the court, on conviction, to pronounce the proper judgment"; an
indictment must also be specific enough to "enable the accused to plead the judgment that may be
given upon it in bar of any prosecution for the same offense." Tex. Code Crim. Proc. Ann.
arts. 21.11, 21.04 (Vernon 1989); Lehman v. State, 792 S.W.2d 82, 84 (Tex. Crim. App. 1990). 
For these reasons, a theft conviction can never rest in whole or in part upon theft of property not
alleged in the indictment as stolen. Lehman, 792 S.W.2d at 84. However, once Current received
proper notice that he must prepare to defend himself against a charge that he has stolen a certain
"bundle" of property, there is no reason that he should be acquitted if the evidence shows him
guilty of stealing enough of the "bundle" to make him guilty of the offense charged. Id. Because
Current had the proper notice to prepare his defense, we find no error in the State's eliciting
testimony of other alleged stolen property not listed in the indictment as long as that property is
not used to surpass the $100,000 value amount. Thus, we overrule the fourth point.
          In his fifth point of error, Current complains the trial court erred at the punishment phase
by allowing the State to introduce evidence of a prior conviction that was void on its face. Once
the State makes a prima facie case the burden shifts to the defendant to show that a prior
conviction is void. Johnson v. State, 725 S.W.2d 245, 246-47 (Tex. Crim. App. 1987). The
State establishes a prima facie case of proof of a prior conviction by introducing copies of the
judgment and sentence and connecting them with the defendant. Id. at 247.
          In this case, the State introduced a copy of the judgment and sentence from Current's prior
felony conviction of Attempt to Take a Weapon from a Peace Officer. Current stipulated that the
judgment and sentence referred to him. Nevertheless, Current alleges that this prior conviction
is void on its face because he had no effective assistance of counsel. Current introduced an order
signed on April 2, 1991, allowing the withdrawal of William Smith as his attorney. The motion
attached to this order cited lack of cooperation as the reason for the withdrawal. On May 17,
1991, Current entered a guilty plea and was sentenced eight years' confinement in accord with a
plea bargain. This judgment shows that Current was "present with attorney Bill Smith." Current
points out that the trial court's docket sheet never indicates the reappointment of Bill Smith as
counsel. Thus, Current contends he was without counsel when he plead guilty making his
conviction void. However, we believe the judgment's recitation that Current's counsel was
present overrides the court's docket sheet.


 Mackintosh v. State, 845 S.W.2d 361, 363-64 (Tex.
App.—Houston [1st. Dist.] 1992, no pet.). Current has the burden to prove his prior conviction
is void. Johnson, 725 S.W.2d at 246-47. He failed to adequately rebut the recitation contained
in the judgment that his counsel was present when he plead guilty. Therefore, we overrule
Current's fifth point.
          We affirm the judgment.
 
                                                                                 REX D. DAVIS
                                                                                 Chief Justice
Before Chief Justice Davis,
          Justice Cummings, and
          Justice Vance
Affirmed
Opinion delivered and filed May 7, 1997.
Do not publish